UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                    )
                                          )    Case No. 17-11527-JGR
WESTMOUNTAIN GOLD, INC.                   )
a Colorado corporation                    )
                                          )    Chapter 11
EIN: 26-1315498                           )
    Debtor.                               )

## MOTION FOR APPROVAL OF LENDING
## AGREEMENT AND FOR AUTHORITY TO INCUR
## DEBT ON AN ADMINISTRATIVE AND SECURED BASIS

The Debtors, WestMountain Gold, Inc. and Terra Gold Corporation (collectively "Debtors"), by and through their attorneys, Kutner Brinen, P.C., move the Court pursuant to 11 U.S.C. §§ 361 and 364(b) and (d)(1), and Bankruptcy Rules 4001 and 9014, for an Order approving the Debtors' Motion For Approval of a Lending Agreement and for Authority to Incur Debt on an Administrative and Secured Basis authorizing the Debtor to borrow up to $1,000,000 from BOCO Investments, LLC, and as grounds therefor state as follows:

## BACKGROUND

1.      The Debtor, WestMountain Gold, Inc. ("WMG") filed for relief under chapter 11 of the Bankruptcy Code on March 1, 2017 and remains a debtor in possession.

2.      Terra Gold Corporation ("TGC") filed for relief under chapter 11 of the Bankruptcy Code on March 1, 2017 and remains a debtor in possession.

3.      WMG is a publicly held company and is the parent company of TGC.

4.      TGC was a joint venture partner with a company known as Raven Gold Alaska, Inc. ("Raven") through February 12, 2014 on a gold system project ("TMC Project") in Alaska.  On February 12, 2014 WestMountain through TGC acquired 100% of the TMC Project from Raven for $1.8 million in cash and 200,000 shares of WestMountain stock.

5.      The Debtors are currently focused on exploration and bulk sample mineral production from mineralized material containing gold at the TMC Project in the state of Alaska. The TMC Project consists of 339 Alaska state mining claims plus an additional 5 unpatented lode mining

claims held under lease (subject to a 3-4% net smelter return royalty to the lessor, dependent upon the gold price) covering 223 square kilometers (22,300 hectares). The property is centered on an 8-km-long trend of gold vein occurrences. All government permits and reclamation plans for continued exploration through 2019 were renewed and the fees to maintain the TGC claims through September 2017 were paid by the Debtor. The property lies approximately 200 kilometers west-northwest of Anchorage and is accessible via helicopter or fixed-wing aircraft. The property has haul roads, a mill facility and adjoining camp infrastructure, a tailings pond and other infrastructure. The remote camp is powered by diesel powered generators and water is supplied to the mill by spring fed sources and a year-round water well.

6.    TGC was a joint venture partner with a company known as Raven Gold Alaska, Inc. ("Raven") through February 12, 2014 on a gold system project ("TMC Project") in Alaska. On February 12, 2014 WestMountain through TGC acquired 100% of the TMC Project from Raven for $1.8 million in cash and 200,000 shares of WestMountain stock.

7.    The Debtors' experienced a significant slough event at its mining property in Alaska on or about September 2, 2016. The event occurred in an area where the Debtor was conducting bulk surface sampling operations. While no injuries occurred and no equipment was lost, all operations at the project ceased. The slough event caused approximately 25,000 tons of rock material to completely cover the main vein in the bulk surface sampling area. The Debtor had been excavating vein material from this area and had excavated approximately 1,357 tons of vein material to date. This mining activity had provided the Debtor with an income that supported its operations.

8.    The Debtors' principal lender is BOCO Investments, LLC ("BOCO"). BOCO has advanced loans to the Debtors over the time period of 2012 through 2017 in the original principal amount of approximately $6,091,255. The loans have not been paid on time and additional interest, fees, and costs have accrued on the loans. The BOCO loans are secured by liens encumbering the WMG and TGC real and personal property.

9.    BOCO's most recent loan to both WMG and TGC was a loan in the amount of $1,224,140 which was advanced in February 2017, pre-petition, to enable TGC to obtain a Certificate of Deposit that had to be pledged to the State of Alaska, Department of Natural Resources

2

in order to guaranty reclamation obligations with respect to the Permit and the TMC Project. Without the guaranty, TGC may have lost its Permit.

      10.     The Debtor currently employs approximately 4 people who work for the Debtor on a full and part time basis.

      11.     The Debtor currently has no available line of credit on which to operate. The Debtor is in need of funding in order to pay operating expenses, fund payroll, and pay administrative expenses. A credit line is necessary to enable the Debtor to meet these expenses.

      12.     The Debtors' principal asset is its TMC Project. The Debtor needs to maintain its operation and meet its obligation to retain the Permits and further develop its mining opportunities in Alaska.

## POST-PETITION LOAN

      13.     Debtor desires to enter into an agreement with BOCO under which BOCO will provide the Debtor with debtor-in-possession financing in the form of a line of credit up to $1,000,000 ("Loan"). The proposed Loan will allow the Debtor to meet its post-petition obligations and provide financial strength that will assure the Debtors the ability to operate and pay post-petition obligations on a timely basis. The post-petition obligations include wages in order preserve the Debtors' goodwill and maintain its ability to develop its mining operations in Alaska. The Debtor also is in need funds to pay ongoing administrative and operational expenses.

      14.     The proposed Loan will be made to WMG as the borrower and guaranteed by TGC.

      15.     The Debtor has prepared a budget of expected post-petition operations through May 8, 2017 which is attached hereto and incorporated herein as Exhibit A ("Budget"). The Budget may be extended by the Debtor but is always subject to approval by BOCO. The proposed Loan will be used by the Debtor initially to fund the Debtor's pre-petition payroll in full or in part and to meet the expenses set forth in the Budget over the first 2 weeks of the case. The Debtors expect that the initial emergency loan is necessary to avoid irreparable harm and injury and will not exceed $150,000.

      16.     The Loan is to be evidenced and governed by the Lending Agreement, a copy of which is attached hereto as Exhibit B. The loan will be further represented by a Promissory Note which is attached to the Lending Agreement and collateralized by a Deed of Trust, Security

Agreement, Assignment of Production, Rents and Leasehold Interests, Financing Statement and Fixture Filing attached hereto as Exhibit C (collectively Exhibits B and C are referred to as "Loan Documents").

17.     BOCO has required that in order to fund the loan, the loan must be secured by a first lien encumbering all assets of the WMG and TGC bankruptcy estates.  The only current lien on the assets of the estates is that held by BOCO.  BOCO consents to the subordination of its existing liens to the new lien granted to BOCO.  Such a lien is appropriate in that the Debtors cannot obtain a loan from any other known source and the existing lender, BOCO, agrees that its pre-petition liens will be adequately protected and consents to subordinate such liens.

18.     The terms of the Loan are set forth in more particularity in the Lending Agreement however the major provisions are summarized as follows:

    a.  The Loan will accrue interest at the rate of 8% per annum prior to Plan confirmation;

    b.  The Loan will mature in one year or earlier in the event of Plan confirmation, an event of default, or conversion of the case to Chapter 7; and

    c.  The Loan will hold administrative expense claim status pursuant to 11 U.S.C. § 364(b) however the Loan shall not be senior to or grounds for disgorgement of those administrative expenses and professional fees paid by the Debtor with the Loan proceeds prior to the maturity date of the Loan.  The Loan will also be secured by a senior lien on all of the WMG and TGC real and personal property assets.

## BENEFIT TO ESTATE

19.     The granting of this Motion is in the best interest of Debtor, the estate and creditors. The Loan will enable the Debtor to retain employees, preserve assets, and maintain operations. The Loan will enable the Debtor to fund operating expenses.  The Loan will also provide the Debtor with the ability to meet expenses until operations can be restarted and/or additional capital can be raised.

20.     The Loan is in the best interest of the Debtor and the estate since it will allow the Debtor to preserve its going concern value.  If the Debtor were to liquidate at this time, unsecured creditors would likely receive nothing.  Through the proposed loan, the Debtor can maintain its going

4

concern value, proceed with the reorganization and generate income or investment capital to pay creditors.

21.     The Debtor believes that the terms of the proposed Loan are fair and reasonable and that the Debtor is unable to obtain post-petition financing on better terms.

22.     Based on the foregoing, and pursuant to 11 U.S.C. §364(b), the Debtor requests authority to borrow up to $1,000,000 from Lender as more particularly set forth herein.

23.     The Debtor further requests that it be authorized to borrow up to $150,000 of the proposed Loan on an emergency basis to fund the payment of expenses for the first two weeks of the case in order to prevent irreparable harm and injury.

WHEREFORE, the Debtor prays that the Court make and enter an Order as follows:

1.     For approval of the Lending Agreement, Promissory Note, and Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Financing Statement and Fixture Filing attached hereto as Exhibits B and C;

2.     Authorizing the Debtor to incur up to $1,000,000 in unsecured debt with administrative expense status and a senior lien on assets as set forth herein from Lender; and

3.     For such further and additional relief as to the Court may appear proper.


DATED: March 1, 2017                         Respectfully submitted,


                                             By:     /s/ Lee M. Kutner
                                                     Lee M. Kutner #10966

                                             KUTNER BRINEN, P.C.
                                             1660 Lincoln St.
                                             Suite 1850
                                             Denver, CO 80264
                                             Telephone: (303) 832-2400
                                             Telecopy: (303) 832-1510
                                             E-Mail: lmk@kutnerlaw.com

WestMountain Gold, Inc.

catchup on payroll

| | Monthly Expenses | Yearly Expenses | 2/27/2017 BUDGET | ACTUAL | 3/6/2017 BUDGET | ACTUAL | 3/13/2017 BUDGET | ACTUAL |
|---|---|---|---|---|---|---|---|---|
| Gold Sales | | $ - | | | | | | |
| | | - | | | | | | |
| | | - | | | | | | |
| | | - | | | | | | |
| Total Incoming | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | |
| Outgoing Cash | | | | | | | | |
| CORPORATE | | | | | | | | |
| Payroll Wage - catchup | 23,000 | 23,000 | | | | | 23,000.00 | |
| Payroll Wages | 27,750 | 333,000 | | | 27,750 | | | |
| Payroll Taxes - catchup | 2,123 | 2,123 | | | | | 2,122.88 | |
| Payroll Taxes | 2,123 | 25,475 | | | 2,123 | | | |
| W/C | 60 | 720 | | | 60 | | | |
| Insurance | 3,614 | 43,371 | | | 3,614 | | | |
| Dental Insurance catchup | 933 | 933 | | | | | 932.82 | |
| Dental Insurance | 360 | 4,319 | | | | | 360 | |
| Telephone | 250 | 3,000 | | | | | | |
| Travel | 5,500 | 66,000 | | | | | 5,500 | |
| Subscriptions | 171 | 2,052 | | | | | 171 | |
| D&O Insurance | 2,925 | 35,100 | | | 2,925 | | | |
| Liability Insurance | 1,953 | 23,436 | | | 1,953 | | | |
| Outside Services | 1,145 | 13,740 | | | | | | |
| Warehouse Lease catchup | 7,844 | 7,844 | | | | | 7,844 | |
| Warehouse Lease | 3,713 | 44,558 | | | | | 3,713 | |
| Warehouse Utilities catchup | 750 | 750 | | | | | 750 | |
| Warehouse Utilities | 699 | 8,388 | | | | | | |
| Legal Services | 5,000 | | | | | | 5,000 | |
| Reorganizational Legal Services 3rd week | 20,000 | | | | | | 20,000 | |
| Alaska Legal | 5,000 | | | | | | 5,000 | |
| EKSH - Accounting Services | | | | | | | 5,000 | |
| Unforecasted Expenses | | | | | 5,000 | | 5,000 | |
| CRITICAL OPERATIONAL EXPENSES | | | | | | | | |
| Porterfield Lease | 125,000 | 125,000 | | | | | | |
| Legal | | | | | | | 10,000 | |
| Consulting - Mining Operations | | | | | | | | |
| Consulting - Bankruptcy | | - | | | | | | |
| | | | | | | | | |
| Subtotal | 216,913 | 739,807 | - | | 43,425 | - | 94,394 | |
| | | | | | | | | |
| Other Expenses | | | | | | | | |
| Tax accountants | - | 5,000 | | | | | | |
| Mailbox | - | 250 | | | | | | |
| Idaho Dept of labor catchup | 213 | 213 | | | | | 213 | |
| | | | | | | | | |
| Total Outgoing before Public Expenses | $ 217,126 | $ 745,270 | $ - | $ - | $ 43,425 | $ - | $ 94,606 | $ - |
| | | | | | | | | |
| Net Loss before Public Expenses | $ (217,126) | $ (745,270) | $ - | $ - | $ (43,425) | $ - | $ (94,606) | $ - |

| Public Expenses | Quarterly Expenses | Yearly Expenses | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Zacks | 1,585 | 7,755 | | | | | | |
| Legal | 3,000 | 12,000 | | | | | | |
| Audit | 8,000 | 59,000 | | | | | | |
| OTC Markets | | 10,000 | | | | | | |
| Corporate Stock | 300 | 3,600 | | | | | | |
| Tax Footnote | 150 | 600 | | | | | | |
| Total Public Expenses | 13,035 | 92,955 | - | | - | | - | |
| | | | | | | | | |
| Total Outgoing Including Public Expenses | | 838,225 | - | | 43,425 | | 94,606 | |
| | | | | | | | | |
| Net Loss After Public Expenses | | $ (838,225) | $ - | $ - | $ (43,425) | $ - | $ (94,606) | $ - |

$ (138,032)

11,155.91
7,585.00
3,570.91

**EXHIBIT A**

| | 3/20/2017 | | 3/27/2017 | | 4/3/2017 | | 4/10/2017 | | 4/17/2017 | | 4/24/2017 | | 5/1/2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BUDGET | ACTUAL | BUDGET | ACTUAL | BUDGET | ACTUAL | BUDGET | ACTUAL | BUDGET | ACTUAL | BUDGET | ACTUAL | BUDGET | ACTUAL |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | 27,750 | | | | | | | | 27,750 | |
| | | | | | 2,123 | | | | | | | | 2,123 | |
| | | | | | 60 | | | | | | | | 60 | |
| | | | | | 3,614 | | | | | | | | 3,614 | |
| | 250 | | | | | | 360 | | | | 250 | | | |
| | 5,500 | | | | | | | | | | 5,500 | | | |
| | | | | | | | 171 | | | | | | | |
| | | | | | 2,925 | | | | | | | | 2,925 | |
| | | | | | 1,953 | | | | | | | | 1,953 | |
| | 1,145 | | | | | | | | | | 1,145 | | | |
| | | | 10,000 | | | | | | | | | | | |
| | 5000 | | 5000 | | | | | | | | | | | |
| | 5,000 | | 5,000 | | 5,000 | | 5,000 | | | | | | | |
| | 125,000 | | | | | | | | | | | | | |
| | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | | | | |
| | 10,000 | | 10,000 | | | | | | | | | | | |
| | 161,895 | - | 40,000 | - | 53,425 | - | 15,531 | - | 10,000 | - | 6,895 | - | 38,425 | - |
| | 5,000 | | | | | | | | | | | | | |
| | $ 166,895 | $ - | $ 40,000 | $ - | $ 53,425 | $ - | $ 15,531 | $ - | $ 10,000 | $ - | $ 6,895 | $ - | $ 38,425 | $ - |
| | $ (166,895) | $ - | $ (40,000) | $ - | $ (53,425) | $ - | $ (15,531) | $ - | $ (10,000) | $ - | $ (6,895) | $ - | $ (38,425) | $ - |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 166,895 | - | 40,000 | - | 53,425 | - | 15,531 | - | 10,000 | - | 6,895 | - | 38,425 | - |
| | $ (166,895) | $ - | $ (40,000) | $ - | $ (53,425) | $ - | $ (15,531) | $ - | $ (10,000) | $ - | $ (6,895) | $ - | $ (38,425) | $ - |

$ (304,927)          $(398,352)

| 5/8/2017 | |
| BUDGET | ACTUAL |
| --- | --- |
| $    - | $    - |
| 360 | |
| 171 | |
| 531 | - |
| $    531 | $    - |
| $    (531) | $    - |
| - | - |
| 531 | - |
| $    (531) | $    - |

| Payroll | Monthly Salary | Employer Taxes | Total |
|---|---|---|---|
| Ryan | 8,000.00 | 612.00 | 8,612.00 |
| Joni | 5,000.00 | 382.50 | 5,382.50 |
| Greg | 10,000.00 | 765.00 | 10,765.00 |
| Merritt | 4,750.00 | 363.38 | 5,113.38 |
| TOTAL | 27,750.00 | 2,122.88 | 13,994.50 |

| Telephone | |
|---|---|
| Ryan | 100.00 |
| Joni | 100.00 |
| Corporate | 50.00 |
| TOTAL | 250.00 |

| Subscriptions | Monthly | |
|---|---|---|
| Quickbooks | 41.00 | |
| Rapidfax | 10.00 | |
| Carbonite | | 60 per year paid 1-12-17 |
| Microsoft 365 | 75.00 | March 10, need credit card |
| BLS software | 45.00 | Gregs software |
| TOTAL | 171.00 | |

| Outside Services | |
|---|---|
| Keenan | 1,000.00 |
| Payroll Processing | 125.00 |
| Bank fees | 20.00 |
| | 1,145.00 |

| Travel | | |
|---|---|---|
| Ryan | 1,500.00 | Ball Mill |
| Ryan/Joni | 3,000.00 | Trip to BOCO office (Joni & Ryan) |

| | | |
|---|---|---|
| Ryan | 1,000.00 | Ryan - trip to Alaska for MSHA renewal |
| Total Travel | 5,500.00 | |

**Warehouse Lease**

| | |
|---|---|
| Past Due | 11,019.00 |
| less payment | (3,175.00) |
| Total Due | 7,844.00 |

| | |
|---|---|
| New Warehouse | 3,713.15 |

**Utilities**

| | | |
|---|---|---|
| Enstar Natural Gas | 114.96 | |
| Chugach Electric | 200.00 | |
| Microcomm | 354.00 | off season |
| AK Waste Water | 30.00 | |
| Total | 698.96 | |

## LENDING AGREEMENT

This Lending Agreement ("Lending Agreement") is entered into as of March, __, 2017 by and between **WestMountain Gold, Inc.**, a Colorado corporation and a Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, Case No. _____ ("Borrower" or "Debtor"), **Terra Gold Corp.**, Debtor's wholly owned Alaska corporation subsidiary, as Guarantor, **BOCO Investments, LLC** ("BOCO"), and any other lender who becomes a party hereto (collectively with BOCO, the "Lenders").

## RECITALS

1.      The Borrower filed a Voluntary Petition for protection under Chapter 11 of the Bankruptcy Code on _____, Case No. _____ ("Chapter 11 Case"). As of the date of this Lending Agreement the Borrower is a Debtor-in-Possession.

2.      The Debtor is an exploration stage mining company that pursues gold projects.  The Debtor and Guarantor are currently focused on mineral production from mineralized material in the state of Alaska ("Business").

3.      The Debtor does not have sufficient funds with which to continue to operate the Business and confirm a Plan of Reorganization without the benefit of post-petition financing as proposed herein.

4.      The Borrower has previously requested that the Lenders make available to the Borrower a credit facility in the aggregate principal amount of up to $1,000,000 ("Facility "). The Facility has been approved by the Court in the Chapter 11 Case.

5.      In order to secure the repayment of the Facility, Borrower will generally provide the Lenders with an allowed administrative expense claim in the Debtor's Chapter 11 case pursuant to Section 364(b) of the Bankruptcy Code having priority over all unsecured debt as an administrative expense.  As additional security for the repayment of the Facility, the Debtor and Guarantor shall each provide the Lenders a first-lien security interest in all assets of both the Debtor and Guarantor.

## AGREEMENT

NOW THEREFORE, the Parties agree as follows:

1.      **Acknowledgment of Recitals**.  The Recitals set forth above are true and correct and are incorporated herein by this reference as a substantive part of this Lending Agreement.

2.      **Definitions**.   The following terms as used herein have the following meanings:

## EXHIBIT B

"**Agreement**" means this Lending Agreement as it may be amended, modified or supplemented from time to time.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978 as amended and codified at 11 U.S.C. §101, *et seq*.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Colorado or any other court having jurisdiction over the Borrower's Chapter 11 case.

"**Borrower**" has the meaning set forth in the heading of this Lending Agreement.

"**Budget**" means a biweekly cash flow forecast, in form and substance reasonably acceptable to Lenders, projecting, among other things, Borrower's cash receipts and disbursements (including the costs of the Chapter 11 Case).  The Budget shall be updated as required in Section 13(d).

"**Chapter 11 Case**" means the case of the Borrower administered under Case No. _____ in the United States Bankruptcy Court for the District of Colorado.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Event of Default**" has the meaning set forth in paragraph 15.

"**Facility**" has the meaning set forth in Recital paragraph 4.

"**Guarantor**" has the meaning set forth in the heading of this Lending Agreement.

"**Loans**" mean the advances made by the Lenders to the Borrower under the Facility set forth in Recital paragraph 4.

"**Loan Documents**" shall mean this Lending Agreement, the Notes, Security Agreement, and any ancillary document which is required or otherwise executed pursuant to this Lending Agreement.

"**Maturity Date**" means the earlier of: (a) the date the Note is accelerated after an Event of Default; (b) the date the Borrower's Chapter 11 case is converted to a Chapter 7 case or dismissed; or (c) one year from the date of this Lending Agreement.

"**Note**" means a promissory note of Borrower payable to the order of any Lender, delivered pursuant to a request of Borrower in substantially the form of Exhibit A evidencing the aggregate indebtedness of Borrower to such Lender resulting from the Loans made by such Lender.

2

**"Parties"** means the Borrower, Guarantor, and Lenders collectively.

**"Post-Petition"** means and refers to any time on or after the petition date of the Borrower's Chapter 11 case, or _____.

**"Security Agreement"** means the Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Financing Statement and Fixture Filing, dated as of the date hereof, from Borrower and Guarantor, as grantors, to BOCO, on its own behalf and as administrative agent for the Lenders.

3.   **Lender Commitment**.  The Lenders agree, on the terms and conditions set forth in this Lending Agreement, to make Loans to the Borrower, pursuant to the Facility and in the form Notes, in the aggregate principal amount not to exceed $1,000,000, subject to the restrictions set forth herein.  Such commitment shall become effective upon approval by the Bankruptcy Court.

4.   **Use of Loan Proceeds**.  The proceeds of the Loans shall be used by the Borrower during the pendency of the Chapter 11 Case exclusively as described in the Budget or, with Lenders' consent after the occurrence of an Event of Default, to fund an orderly liquidation of the Collateral.  Borrower agrees to provide any and all profit and loss statements, financial statements and other documents as may be reasonably requested by a Lenders within thirty (30) days after a Lenders' written request for such documentation.

5.   **Maturity of Loans**.  The Loans shall mature and the principal amount thereof shall be due and payable on the Maturity Date.

6.   **Interest**.  The Loans shall bear interest on the outstanding principal amount thereof, for each day from and including the date each Loan was made to the Debtor but excluding the date on which the Loan becomes due at a rate per annum (computed on the basis of the actual days elapsed over a year of 365 days) equal to 8% prior to confirmation of the Plan and 8% thereafter.  After default, the Loans shall bear interest in the same manner as set forth above at the rate of 14% per annum.  Interest on the Loans shall accrue and be due and payable upon prepayment or at the Maturity Date for the Loans, whether by acceleration or otherwise and after the Maturity Date on demand.

7.   **Prepayment**.  The Borrower shall have the right at any time and from time to time to prepay the Facility in whole or in part.  All prepayments shall be accompanied by accrued but unpaid interest on the principal amount of the Loans being prepaid to the date of prepayment.  Once a prepayment is made, whether it is mandatory or discretionary, it may be re-advanced to the Borrower with the express written consent of Lenders.

8.   **Priority Interest**.  Pursuant to Section 364(b) of the Bankruptcy Code the Loans shall constitute an allowed administrative expense claim in the Chapter 11 case. Notwithstanding the priority nature of the Loan during the Borrower's Chapter 11 case, the

3

co-equal priority shall not be grounds for disgorgement of those professional fees or other administrative expenses which have been paid by the Borrower with the proceeds of the Loan pursuant to the terms of the Loan and prior to the Maturity Date for the Loan.  Pursuant to Section 364(d)(l) of the Bankruptcy Code, the Bankruptcy Court shall approve the Security Agreement as a valid, binding, continuing, enforceable perfected first-priority senior priming lien on all of the property Borrower and Guarantor, which is effective without any requirement for filing or recording under applicable state law.

9.    **Conditions Precedent**.  The obligation of a Lender to make a Loan to the Borrower is subject to the satisfaction of the following conditions precedent, unless waived by the Lender:

   a.   The Lender shall have received the duly executed Note payable to the order of the Lender.

   b.   The Lender shall have received evidence satisfactory to it that the Security Agreement has been duly executed by the Borrower and Guarantor and approved by the Bankruptcy Court as provided herein.

   c.   The Lender shall have received evidence satisfactory to it that all conditions precedent to making the advance have been met.

   d.   The Lender shall have received a copy of a final order from the Bankruptcy Court approving this Lending Agreement which shall have been entered by the Bankruptcy Court on such notice and with such terms as may be satisfactory to the Lenders and the Borrower and which shall have not been reversed, modified, annulled, vacated or stayed.

   e.   The Lender shall have received and approved the Budget that details the use of the Loan proceeds.

   f.   The Lender shall have received all documents it may reasonably request.

   g.   The Lender shall be satisfied, in its good faith discretion, that there has been no material adverse change in Borrower's financial condition or the prospects for a successful reorganization.

   h.   Prior to making available each Loan under the Facility, the Lender shall have received a statement in form and substance satisfactory to the Lender and such other information as may reasonably be requested by the Lenders.

10.    **Representations and Warranties**.  In order to induce the Lenders to make the Loans under the Facility, the Borrower and Guarantor represent and warrant, as applicable, following:

4

a. The Borrower and Guarantor have the requisite power and authority to affect the transactions contemplated herein and has all requisite power and authority and the legal right to own and operate its property as is contemplated under this Lending Agreement.

b. The execution, delivery and performance by the Borrower and Guarantor of each of the Agreement and Note are within the power of the Borrower and Guarantor, as applicable, and have been duly authorized and delivered by the Borrower and Guarantor and the Note will be when executed and delivered hereunder a valid, legal and binding obligation of the Borrower enforceable against the Borrower and Guarantor in accordance with its terms and will not violate any law, regulation or Court order.

11.   **Environmental Law Compliance.**   The Borrower and Guarantor have complied, is currently in compliance and will continue to comply in all respects with any and all environmental laws, ordinances, orders or decrees of any state, federal, municipal or other governmental body or agency applicable to the Borrower, including but not limited to, the State of Alaska and those of the United States.

12.   **No Defenses.**   The Borrower is justly indebted to the Lenders for the obligations created by this Lending Agreement and the Borrower and Guarantor do not currently have and agree that they will not at any time hereafter assert any defense, offset or counterclaim with respect to the payment of its obligations under this Lending Agreement and the Notes.

13.   **Affirmative Covenants.**

a. The Borrower shall provide the Lenders with all interim statements and operating reports ("Reports") filed by the Borrower with the Office of the United States Trustee concurrently with the filing of the Reports, either by facsimile or personal delivery. Those reports must be filed on or before the 15th day of each calendar month during the term of the Agreement and the Debtor agrees to timely file all such reports.

b. The Borrower shall provide the Lenders with an annual balance sheet, statement of income and retained earnings and statement of changes in financial position, all of the Borrower and Guarantor for the past fiscal year. Such financial statement shall be provided within ninety (90) days of the end of each fiscal year of the Borrower and Guarantor during the term of this Lending Agreement. From time to time hereafter, Lenders may discover that they require further financial reports and information from Borrower or Guarantor. The Borrower and Guarantor agree to fully cooperate with the Lenders and provide Lenders with such requested reports and information as

5

may reasonably be requested within five business days of its receipt of the Lender's written request.

c. The Borrower will keep proper books of record and accounting in which true and correct entries in conformity with Generally Accepted Accounting Principles shall be made of all dealings and transactions in relation to its business and activities and will permit representatives of the Lenders to visit and inspect any of its properties to examine and make abstracts from any of its books and records and to discuss its affairs, finances and accounts with its officers, appropriate employees, independent public accountants, consultants and financial advisors at all such reasonable times during normal business hours upon reasonable notice.

d. On or before each applicable Wednesday at 5:00PM Mountain Time, Borrower and Guarantor shall provide Lenders with an updated Budget.

e. The Borrower and Guarantor will keep all material property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted; will maintain, with a financially sound and reputable insurance company, insurance on all its property in at least such amounts and against at least such risks as are usually insured against by companies of established repute engaged in the same or similar business and will furnish to the Lenders upon written request full information as to the insurance carrier.

f. The Borrower and Guarantor will comply with all court orders in the Chapter 11 case.

g. The Borrower and Guarantor will pay all agreed obligations arising under this Lending Agreement after the execution of the Agreement promptly and in accordance with the terms and conditions hereof and pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property before the same shall become in default as well as all material lawful claims for labor, materials and supplies which if unpaid might become a lien or a charge upon assets of the Borrower.

14.    **Further Assurances.**   Upon the request of the Lender, the Borrower and Guarantor shall duly execute and deliver or cause to be duly executed and delivered at the cost and expense of the Borrower and Guarantor such further instruments as may be necessary or proper in the reasonable judgment of the Lenders to carry out the provisions and purposes of this Lending Agreement.

15.    **Events of Default.**   Any one or more of the following events shall have occurred and be continuing shall constitute an Event of Default:

6

a.  The Borrower or Guarantor shall fail to pay within ten (10) days of the due date the obligations created by this Lending Agreement, the Notes, or the Security Agreement;

b.  The Borrower or Guarantor shall fail to observe or perform any covenant, agreement or obligation contained in this Lending Agreement, the Notes, or the Security Agreement;

c.  The Borrower or Guarantor shall use Loan proceeds for purposes other than as was described in the Budget provided Lender under Section 9(e).

d.  Any representation, warranty, certification or statement made by the Borrower or Guarantor in this Lending Agreement or in any Budget, certificate, financial statement or other document delivered pursuant hereto shall prove to have been incorrect in any material respect when made or deemed made;

e.  This Lending Agreement shall cease to be in full force and effect and valid or any security interest or lien purported to be created hereby shall cease to be valid and perfected or the Borrower or Guarantor shall so have asserted;

f.  The Order approving this Lending Agreement shall be modified, vacated, supplemented or amended in any respect or the Borrower or Guarantor shall apply to the Bankruptcy Court for authority to do so without the prior written consent of the Lenders;

g.  The Bankruptcy Court shall enter an Order:

  i.  Dismissing the Chapter 11 case;

  ii.  converting the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code;

  iii.  appointing a Trustee in the Chapter 11 case

h.  There shall arise any new lien in the Chapter 11 case encumbering any presently unencumbered assets owned by the Borrower or Guarantor;

i.  The Bankruptcy Court shall enter an Order approving a Disclosure Statement in connection with a Plan of Reorganization proposed by the Borrower or a third party which Plan does not provide for payment in full in cash of the Notes on the Maturity Date or upon confirmation of the proposed Plan;

7

j.  Any non-monetary judgment or order with respect to a pre- or post-petition transaction or event shall be entered against the Borrower or Guarantor which does or could reasonably be expected to cause a material adverse condition determined at the sole discretion of the Lenders;

k.  There occurs any effective or actual change in control of the Borrower or Guarantor absent the prior written consent of the Lenders; or

l.  The Lenders deems themselves insecure as a result of a material adverse change in the Borrower's financial condition, prospects, liquidity or ability to service its financial obligations;

and in every such Event of Default and at any time thereafter during the continuance of such Event of Default without further order of or application to the Bankruptcy Court the Lenders may take any or all of the following actions at the same or at different times:

i.  by notice to the Borrower terminate the Facility;

ii.  by notice to the Borrower declare the Notes together with all interest, fees and expenses accrued thereon to be and the Notes shall thereupon become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower and Guarantor; and

iii.  upon written notice to the Borrower and Guarantor exercise such remedies as are provided for elsewhere in this Lending Agreement, the Notes, the Security Agreement or as may otherwise be available under applicable law.

16.  **Notice**. Delivery of any notice required herein to be given to the Borrower or Guarantor shall be deemed sufficient and complete if any such letter or notice is sent by messenger, Federal Express and/or emailed to the Borrower and Borrower's attorney at the following address:

_____

_____

_____

with a copy to:

Lee M. Kutner, Esq.
Kutner Brinen, P.C.
1660 Lincoln St.

8

Suite 1850
Denver, CO 80264
Email: lmk@kutnerlaw.com

Notice to Lender shall be deemed sufficient and complete if such letter or notice is sent by Federal Express and email to:

Patrick J. Kanouff
262 E. Mountain Ave.
Fort Collins, CO 80528
Email: patrick@bohemaincompanies.com

with a copy to:

Darrell G. Waas, Esq.
Waas Campbell Rivera LLP
1350 17th Street
Suite 450
Denver, CO 80202
Email: waas@wcrlegal.com

17.    **Integration**.  Except as expressly provided in this Lending Agreement, this Lending Agreement is the final written expression and the complete and exclusive statement of all of the agreements, conditions, promises and covenants among the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations, representations, understandings and discussions among the parties and/or their respective counsel with respect to the subject matter covered hereby.  Any amendment or modification to this Lending Agreement, in order to be legally binding, must be in writing specifically referring to the Agreement and signed by duly authorized representatives of all parties, or otherwise approved by the Bankruptcy Court.

18.    **No Benefit to Nonparties**.  Nothing contained in this Lending Agreement is intended nor shall it be construed or deemed to confer any rights, powers, or privileges on any person, firm, partnership, corporation or other entity not an express party hereto or a successor in interest thereof.  The parties reserve all of their rights under law, equity, or otherwise with respect to such non-parties and/or successors in interest.

19.    **Terms Binding On Trustee**.  The terms and conditions of this Lending Agreement and the order entered thereon shall be binding upon any Trustee appointed in Borrower's Chapter 11 case.

20.    **Limitation of Relationship**.  The relationship of Borrower and any Lender shall continue to be that of borrower and creditor. Nothing contained in this Lending

9

Agreement shall be deemed or construed to create any partnership, tenancy-in-common, joint tenancy, joint venture, co-ownership or other relationship between a Lender and Borrower.

21.     **Power of Representatives**.  Any party executing this Lending Agreement in a representative capacity is duly authorized and empowered to do so.

22.     **Counterparts**.  This Lending Agreement may be executed in any number of counterparts, each of which shall be an original. Such counterparts shall together constitute but one and the same Instrument.

23.     **Waiver**.  No failure or delay by the Lender in exercising any right, power, or privilege hereunder or under the Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

24.     **Expenses**.  If an Event of Default occurs the Borrower shall pay all out-of-pocket expenses incurred by the Lenders including reasonable attorneys fees and disbursements of Lenders' counsel in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom.

25.     **Successors and Assigns**.  This Lending Agreement shall be binding upon and inure to the benefit of the Lenders and all further holders of the Notes and their respective successors and assigns.  This Lending Agreement shall be binding upon the Borrower and Guarantor and their successors, however, the Borrower and Guarantor may not assign or transfer any of their rights or obligations under this Lending Agreement without the prior written consent of the Lenders.

26.     **Choice of Law**.  This Lending Agreement and the Note shall be construed in accordance with and governed by the laws of the State of Colorado except to the extent preempted by federal law.

27.     **Effectiveness**.  This Lending Agreement shall not become effective until it has been executed by the Borrower and the Lender and a final order has been entered in the Borrower's bankruptcy case approving this Lending Agreement.

*[signature page follows]*

10

The parties hereto have caused this Secured Lending Agreement to be duly executed as of the date first written.

**LENDER:**

**BOCO Investments, LLC**
By: Bohemian Asset Management, Inc.
Its: Managing Member

_____
Joseph C. Zimlich, President

**BORROWER:**

**WestMountain Gold, Inc.**

_____
By:_____
Its:_____

**GUARANTOR:**

**Terra Gold Corp.**

_____
By:_____
Its:_____

11

# SECURED PROMISSORY NOTE

**Denver, Colorado**                                                    March __, 2017

FOR VALUE RECEIVED, the undersigned, **WestMountain Gold, Inc.**, Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, Case No. 17-_____ ("Borrower"), hereby unconditionally promises to pay on or before the "Maturity Date", as defined in the Lending Agreement dated March __, 2017 ("Lending Agreement"), to the order of _____, its successors and assigns ("Lender") at _____, or such other place and manner as may be designated by Lender, in lawful money of the United States of America, immediately available funds, the outstanding principal balance of the borrowings as set forth in the last entry on the Schedule attached hereto (the "*Loan Amount*"), which shall not exceed $1,000,000, and the aggregate amount of fees, accrued and unpaid interest, and costs accrued thereon.

THE OBLIGATIONS DUE UNDER THIS SECURED PROMISSORY NOTE ARE SECURED BY THAT CERTAIN SECURITY AGREEMENT, DATED _____, 2017 AND THE LENDING AGREEMENT, BOTH EXECUTED BY BORROWER AND TERRA GOLD CORP. AS GUARANTOR IN FAVOR OF HOLDER (THE "*SECURITY AGREEMENTS*").

All terms not otherwise defined herein shall have those definitions as are ascribed to those terms in the Lending Agreement.

1.    <u>Repayment</u>.  Interest shall accrue on the outstanding principal balance of this note but shall not be compounded.  The outstanding Loan Amount this Note, together with any accrued but unpaid interest thereon, shall be due and payable on or before the date that is one year from the date of the Lending Agreement, or earlier as provided in the Lending Agreement (the "Maturity Date").  All payments shall be applied first to accrued interest and then to principal.

2.    <u>Interest</u>.  This Note shall accrue interest in like money on the outstanding Loan Amount from the date of disbursement at the rate of 8% per annum.  After default, the outstanding Loan Amount shall bear interest at the rate of 14% per annum (the "Default Rate").  Accrued interest on the outstanding Loan Amount shall be payable upon any prepayment or at the Maturity Date, whether by acceleration or otherwise and after the Maturity Date on demand.

3.    <u>Prepayment</u>.  The indebtedness evidenced hereby may be prepaid in whole or in part, at any time and from time to time, without penalty. Any such payments shall be credited first to any accrued and unpaid interest and then to the outstanding principal balance hereof.

4.    <u>Waiver</u>.  Borrower waives presentment, notice of dishonor and protest.

5.    <u>Extension</u>.  Borrower agrees that the Maturity Date of this Note, or any payment due hereunder, may be extended at any time or from time to time by Holder without releasing, discharging, or affecting Borrower's liability.

6. <u>Invalidity</u>. Any provision of this Note that is deemed invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note.

7. <u>Attorneys' Fees</u>. In the event a suit, action, arbitration, or other proceeding of any nature whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is instituted, or the services of an attorney are retained, to interpret or enforce any provision of this Note or with respect to any dispute relating to this Note, the prevailing party shall be entitled to recover from the losing party its attorneys', paralegals', accountants', and other experts' fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith. In the event of suit, action, arbitration, or other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts provided by law.

8. <u>Relationship of Parties</u>. Nothing in this Note shall create a relationship between Borrower and Holder of partnership or of principal and agent, it being their intent that their relationship is that of debtor and creditor.

9. <u>Default</u>. An Event of Default shall have occurred under this Note if the Borrower fails to pay or perform within ten (10) days of the Maturity Date any of the payments or obligations created by this Note. Upon occurrence of an Event of Default, all sums due hereunder shall be accelerated and shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower.

10. <u>No Waiver</u>. No failure to accelerate the indebtedness evidenced hereby by reason of default hereunder, acceptance of a past-due installment or other indulgence granted from time to time, shall be construed as a novation of this Note or as a waiver of such right of acceleration or of the right of Lender to insist upon strict compliance with the terms of this Note or to prevent the exercise of such right of acceleration or any other right granted hereunder or by applicable laws. No extension of the time for payment of the indebtedness evidenced hereby or any installment due hereunder, made by agreement with any person or entity now or hereafter liable for payment of the indebtedness evidenced hereby, shall operate to release, discharge, modify, change or affect the original liability of the Borrowers hereunder or that of any other person now or hereafter liable for payment of the indebtedness evidenced hereby, either in whole or in part, unless Lender agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

11. <u>Notices</u>. Notices under this Note shall be made as provided in the Lending Agreement.

12. <u>Governing Law</u>. The validity, meaning, enforceability and effect of this Note, and the rights and liabilities of the parties, shall be determined in accordance with the laws of the State of Colorado.

2

13.   <u>Schedule</u>.   Lender will enter on the Schedule the principal amount of each borrowing by Borrower, any repayment of principal which Borrower makes, the date on which each such borrowing or repayment is made, and the outstanding Loan Amount as a result of each such borrowing or repayment.   Borrower hereby authorizes Lender to make such entries and agrees that those entries and the outstanding Loan Amount as shown on the Schedule will constitute conclusive evidence of all borrowings and repayments and the dates thereof and of the outstanding Loan Amount under this Note.

Dated as of the date first set forth above.

**BORROWER:**

**WestMountain Gold, Inc.**
a Colorado corporation

By: _____

Name: _____

Title: _____

## SCHEDULE OF BORROWINGS

| Date | Amount of Borrowing (U.S.$) | Outstanding Principal Balance |
|------|------------------------------|-------------------------------|
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |
|      |                              |                               |

**Real Property APNs listed on Exhibit A attached hereto**

**Recording Requested By, and when Recorded, return to:**
Name: _____
Address: _____

**DEED OF TRUST, SECURITY AGREEMENT,**
**ASSIGNMENT OF PRODUCTION, RENTS AND LEASEHOLD INTERESTS,**
**FINANCING STATEMENT AND FIXTURE FILING**

**FROM**

**WESTMOUNTAIN GOLD, INC. and TERRA GOLD CORP., as Grantors**

**TO**

**[TBD], as Trustee**

**AND**

**BOCO INVESTMENTS, LLC, as Beneficiary**

**DATED AS OF MARCH __, 2017**

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.

THIS INSTRUMENT SECURES FUTURE ADVANCES.

THIS DEED OF TRUST SECURES AN UNLIMITED MAXIMUM PRINCIPAL AMOUNT.

THE OBLIGATIONS SECURED HEREUNDER AT THE TIME OF FILING TOTAL MORE THAN $_____ IN PRINCIPAL ONLY, EXCLUSIVE OF ACCRUED INTEREST.

THIS INSTRUMENT COVERS FIXTURES AND GOODS THAT WILL BECOME FIXTURES ON THE PROPERTY DESCRIBED IN EXHIBIT A.

THIS INSTRUMENT COVERS AS-EXTRACTED COLLATERAL.

## DEED OF TRUST, SECURITY AGREEMENT,
## ASSIGNMENT OF PRODUCTION, RENTS AND LEASEHOLD INTERESTS,
## FINANCING STATEMENT AND FIXTURE FILING

This Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests and Financing Statement (the "*Deed of Trust*") is entered into by and among **WestMountain Gold, Inc.,** a Colorado corporation whose address is 120 E. Lake Street, Suite 401, Sandpoint, ID 83864 (herein called "*WMTN*"), **Terra Gold Corporation,** an Alaska corporation whose address is also 120 E. Lake Street, Suite 401, Sandpoint, ID 83864 (herein called "*TGC*") (WMTN and TGC are herein called "*Grantors*"), **[TBD]**, whose address is [*] (herein called "*Trustee*"), and **BOCO Investments, LLC,** a Colorado limited liability company whose address is 262 E. Mountain Ave., Fort Collins, CO 80524 (herein called "*BOCO*" or "*Beneficiary*").

### Recitals

A.     WMTN filed a Voluntary Petition for protection under Chapter 11 of the Bankruptcy Code on _____, Case No. _____ ("Chapter 11 Case").

B.     WMTN is an exploration stage mining company and TGC is WMTN's wholly owned subsidiary.

B.     TGC holds a Miscellaneous Land Use Permit (a "MLUP") under Application for Permits to Mine in Alaska ("APMA") #3001 approved by The Alaska Department of Natural Resources (the "*ADNR*").

C.     WMTN has previously requested that the Beneficiary make available to WMTN a credit facility in the aggregate principal amount of up to $1,000,000 ("Facility "). The Facility has been approved by the Court in the Chapter 11 Case.

D.     This Deed of Trust secures the repayment of the Facility, any and all of the Grantors' obligations under that certain Lending Agreement among the parties hereto (together with the Note, the "Lending Agreement") and any and all other financial obligations Grantors, or either of them, may have to Beneficiary (as further enumerated in the Lending Agreement). Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Lending Agreement.

C.     Grantors own, hold, use, have the benefit of or have an option to purchase those certain properties consisting of State of Alaska mining claim locations ("*State Mining Claims*"), mineral rights, leasehold interests and other rights and interests in that certain property approximately 125 miles west-northwest of Anchorage, Alaska as further described herein, including on Exhibit A attached hereto and incorporated herein by reference, which are commonly referred to as the "Mine".

D.     Upon foreclosure, pursuant to the terms and conditions stated herein, the Beneficiary may elect to pursue a non-judicial foreclosure pursuant to the power of sale granted herein or a judicial foreclosure.

**EXHIBIT C**

## Agreement

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1 – CREATION OF SECURITY

Section 1.1 <u>Grant</u>.    In consideration of the credit advanced under the Lending Agreement, and in consideration of the mutual covenants contained therein and herein, and for the purpose of securing payment and performance of the Obligations (as defined below in Section 1.4), Grantors hereby grant, bargain, sell, warrant, assign, pledge, transfer and convey to the Trustee, IN TRUST, WITH POWER OF SALE, and right of entry and possession, subject to the terms hereof, for the benefit of the Beneficiary, all right, title and interest in and to the following real and personal property, rights, title and interests (collectively, the "*Collateral*"), whether presently owned or held or hereafter acquired:

(a)    <u>Lands and Realty</u>.    All (i) lands and real property, including all fee, leasehold, mineral, option rights, patented mining claims, patented millsite claims, unpatented mining claims (lode and placer), unpatented millsites, State Mining Claims, tunnel sites and rights, amended claims, relocated claims, royalties and other real property interests (whether surface, underground, mineral, or other), and (ii) leases and subleases (howsoever named or characterized), licenses of use, exploration agreements, joint venture agreements and other agreements and rights in, to or relating to land or minerals or the use, development, exploitation or extraction of any part thereof or of any mineral therefrom, including the leasehold interest covered thereby (collectively, the "*Leases*"), including any extensions, continuation, reinstatements or renewals; in each case, with the foregoing rights, titles and interests being more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by reference (collectively, the "*Lands*");

(b)    <u>Additional Land</u>.    All additional lands, estates, rights and interests hereafter acquired by either of the Grantors for use in connection with the Lands and the development of the Lands and all additional lands, estates, rights and interests therein which may, from time to time, by amendment, modification, supplement or otherwise, be expressly made subject to the lien of this instrument, including whether by the location of new unpatented mining or millsite claims, the amendment of any unpatented mining or millsite claims, the relocation of any unpatented mining or millsite claims or State Mining Claims, the acquisition of property or otherwise, all of which shall be included in and constitute part of the Lands;

(c)    <u>Gold, Silver and Minerals</u>.    All gold, silver and other ores, minerals, metals, mineral elements and compounds, dore, concentrate, veins, lodes and mineral deposits that are on, in, under, extending from or into, produced or to be produced from, stored, stacked, handled, processed, refined, beneficiated, transported or marketed on or from all or any part of the Lands, including "As-Extracted Collateral" as defined in Alaska Statute ("*AS*") 9.102 (Section 9.102 of the Alaska Uniform Commercial Code (as amended from time to time, the "*UCC*")), all whether in place, extracted, produced, processed, stored or otherwise severed (collectively, the "*Minerals*");

2

(d)     <u>Fixtures and Improvements</u>.  All buildings, structures, additions, mills, crushers, facilities, offices, shops, tanks, pipelines, fixtures and other improvements, howsoever designated, now or hereafter located or constructed on the Lands, affixed to the Lands or otherwise related to or associated with the Lands and the improvements thereon (collectively, the "*Improvements*");

(e)     <u>Water Rights</u>.  All water, water rights (whether vested, certificated, permitted or otherwise, whether or not adjudicated, and whether or not with a place of use or point of diversion on the Lands), water right applications, reservoirs and reservoir rights, ditches and ditch rights, irrigation systems and irrigation rights, wells, well permits and other rights of use appertaining or belonging to or used in connection with the Lands and all wells, pumps, pumping stations, machinery and equipment associated therewith, and all shares of stock or similar interest (if any) evidencing reservoir, ditch, irrigation or other water rights or rights of use (collectively, the "*Water Rights*");

(f)     <u>Access Rights</u>.  All rights of way, easements, licenses, profits, privileges, tenements, hereditaments, appurtenances, roads, trails, transportation improvements, and other access rights or rights of use appertaining or belonging to or used in connection with the Lands, the Water Rights and/or the Improvements (collectively, the "*Access Rights*");

(g)     <u>Property Data</u>.  All records, data, reports and information relating to or associated with all or any portion of the Lands, the Minerals or the Water Rights, including maps, surveys, drilling data, drill logs, core samples and core data, technical, engineering and permitting information and reports, and all geological, metallurgical, geophysical, geochemical and analytical data, information and reports, in whatever form and however stored, whether physical, electronic or otherwise (collectively, the "*Data*");

(h)     <u>Permits and Approvals</u>.  All approvals, authorizations, licenses, permits, consents, variances, land use entitlements, applications, plans, bonds, filings or registrations by, with or from any governmental authority (federal, state or local) or other person associated with or necessary for the use or development of all or any portion of the Lands, Minerals, Improvements, Water Rights or Access Rights and all bonds, letters of credit and other financial accommodations that secure the performance of the foregoing (collectively, the "*Permits*");

(i)     <u>Accounts; Contract Rights; General Intangibles</u>.  All accounts, accounts receivable, contracts and contract rights, option and purchase rights, agreements, documents, instruments, income, receipts, revenues, earnings, rents, profits, deposits, security deposits, royalties and revenue arising from the use or enjoyment of all or any portion of the Lands, the Improvements or other Collateral, from the production, crushing, milling, treatment, storage, marketing, hedging, sale or transfer of all or any portion of the Minerals and from the use, sale, assignment, conveyance or transfer of all or any portion of any other Collateral (collectively, the "*Accounts*");

(j)     <u>Machinery; Equipment; Personal Property</u>.  All goods, machinery, equipment, drilling rigs and equipment, facilities, parts, supplies, power lines, tools, vehicles, trucks, rolling stock, furnishings, apparatus, inventory, fixtures and other personal property of

every kind and nature, howsoever defined and whether or not attached or affixed in any manner to any building, structure or Improvement on the Lands (collectively, the "*Personal Property*");

(k)     All Associated Property.   All other property (whether real, personal or mixed), right, title or interest of any kind, nature or character, howsoever defined or identified, related to or associated with the Project, the Lands, the Minerals, the Improvements, the Water Rights, the Access Rights, the Data, the Permits, the Accounts, the Personal Property or other property described herein (collectively, the "*Associated Property*"); and

(l)     Proceeds and Products.   All proceeds and products of the Lands, Minerals, Improvements, Water Rights, Access Rights, Data, Permits, Personal Property, Accounts and other property rights and interests described herein; and

(m)     Excluded Assets.   Notwithstanding the foregoing, the Collateral shall not include "Excluded Assets" (as defined below) until such time as the prohibitions causing such property to be Excluded Assets have terminated (howsoever occurring); upon the termination of such prohibitions such property will be deemed to automatically be and at all times from and after the date hereof to have been, without the taking of any action or delivery of any instrument, Collateral. "Excluded Assets" means, collectively, (i) any permit or license or any contractual obligation (and the equipment, fixture or goods subject thereto) entered into by a Grantor (A) that prohibits or requires the consent of any Person other than a Grantor or any affiliate of a Grantor (each, a "*Related Party*") which has not been obtained as a condition to the creation by a Grantor of a security interest, lien, charge or other encumbrance (each a "*Lien*") on any right, title or interest in such permit, license or contractual obligation, (B) in which the creation of a Lien would result in the abandonment, invalidation or unenforceability of any such permit, license or contractual obligation or (C) to the extent that any requirement of law applicable thereto prohibits the creation of a Lien thereon, but only, with respect to the prohibition in (A), (B) and (C), to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other requirement of law, (ii) property owned by a Grantor that is subject to a purchase money Lien or a capital lease permitted under the Lending Agreement if the contractual obligation pursuant to which such Lien is granted (or in the document providing for such capital lease) prohibits, or requires the consent of any Person other than a Grantor or any Related Party which has not been obtained as a condition to, the creation of any other Lien on such equipment, and (iii) any "intent to use" trademark applications for which a statement of use has not been filed (but only until such statement is filed); *provided,* that "Excluded Assets" shall not include any proceeds, products, substitutions or replacements of any Excluded Asset (unless such proceeds, products, substitutions or replacements would itself be an Excluded Asset); *provided, further,* that to the extent that such property constitutes an Excluded Asset due to the failure of a Grantor to obtain consent as described in clause (ii), Grantors shall use commercially reasonable efforts to obtain such consent, and, upon obtaining such consent, such property shall cease to constitute an "Excluded Asset".

TO HAVE AND TO HOLD all of the Collateral, together with all and singular the rights, privileges, benefits, contracts, hereditaments and appurtenances now or hereafter at any time before the foreclosure or release hereof, in any way appertaining or belonging thereto, unto the Trustee and to its substitutes or successors, forever, IN TRUST, upon the terms and conditions

4

herein set forth; and Grantors hereby bind and obligate themselves and their successors and assigns, to warrant and to defend, all and singular, title to the Collateral unto the Trustee, its substitutes or successors, forever, against the claims of any and all persons whomsoever claiming any part thereof.

Section 1.2 <u>Creation of Security Interest</u>.  In addition to the grant contained in <u>Section 1.1</u>, and for the same consideration and purpose, Grantors hereby grant to the Beneficiary a first and prior continuing security interest in all Collateral constituting personal property, now owned or hereafter acquired by Grantors, and in all Proceeds thereof (as defined below).  Grantors, without limiting the foregoing provisions of this <u>Section 1.2</u>, stipulate that the grant made by this <u>Section 1.2</u> includes a grant of a security interest in all Minerals extracted or produced from or otherwise attributable to or severed from the Lands and in the Proceeds resulting from sale of such Minerals, such security interest to attach to such Minerals as-extracted, at the minehead of any mine located thereon, and to the Accounts resulting from such sales.  "Proceeds" shall have the meaning given to such term in Article 9 of the UCC, and includes whatever is received or receivable upon the sale, exchange, collection or other disposition of the Collateral and insurance payable or damages or other payments by reason of loss or damage to the Collateral, and all additions thereto, substitutions and replacements thereof or accessions thereto.

Section 1.3 <u>Pledge and Assignment</u>.  Grantors hereby grant and make a common-law pledge and assignment to the Beneficiary of all Refinery Accounts (defined below) and all credit balances therein from time to time.  "*Refinery Accounts*" means any account or allocation, and the credit balances in dollars or Minerals therein, of or for the benefit of a Grantor at or with any refinery, smelter or processing facility to which Minerals severed from or attributable to the Lands are delivered or held.

Section 1.4 <u>Obligations Secured</u>.  This instrument is executed and delivered by Grantors to secure and enforce the irrevocable, full, punctual and complete payment and performance when due (whether at declaration, acceleration, demand or otherwise) of:

      (a)      The Lending Agreement and the Loans made thereunder;

      (b)      Any and all other or additional indebtedness, liabilities or sums for which a Grantor is now or may become liable to the Beneficiary or the Trustee in any manner, whether under this instrument, the Lending Agreement or any other or future instrument or document, either primarily or secondarily, absolutely or contingently, directly or indirectly, jointly, severally, or jointly and severally, and whether matured or unmatured, and whether or not created after payment in full of the Obligations if this instrument shall not have been released of record by Beneficiary;

      (c)      The prompt and complete performance of all obligations under the Lending Agreement as and when due;

      (d)      All renewals, extensions, amendments, modifications, restatements and changes of, or substitutions or replacements for, all or any part of the items described above; and

(e)    Each and every covenant and agreement of a Grantors contained in the Lending Agreement.

The indebtedness, liabilities and obligations secured hereby, as described in the foregoing clauses (a) – (h) are sometimes referred to herein as the "*Obligations*".

Section 1.5  Proceeds.  The security interest of the Beneficiary hereunder in the Proceeds shall not be construed to mean that the Beneficiary consents to the sale or other disposition of any part of the Collateral other than Minerals extracted from or attributable to the Lands and sold in the ordinary course of business.

Section 1.6  Future Advances.  Grantors, and each party at any time claiming an interest in or lien or encumbrances against the Collateral, agree that all advances made by the Beneficiary from time to time under the Lending Agreement (for which a Grantor is liable thereunder), and all other portions of the Obligations herein referred to, shall be secured by this Deed of Trust with priority as if all of the same had been advanced, had arisen or became owing or performable on the date of this Deed of Trust.  No reduction of the amount due under the Lending Agreement or the Loans made thereunder shall extinguish, release or subordinate any rights, titles, interests, liens, security interests, powers or privileges intended, created or arising hereunder or under the Lending Agreement, and this Deed of Trust shall remain in full force and effect as to any subsequent advances or subsequently arising portions of the credit accommodations or indebtedness without loss of priority until all Obligations are fully paid, performed and satisfied, all agreements and obligations, if any, of the Beneficiary for future advances have been terminated, and this Deed of Trust has been released of record by Beneficiary.  This Deed of Trust shall not adversely affect the validity or time of perfection of any security interest arising in favor of Beneficiary as a result of acts or agreements of Beneficiary and/or Grantors occurring or arising prior to the date hereof.

Section 1.7  Continuing Status of Lien, Security Interest and Pledge.  So long as the Obligations remain in effect, and this Deed of Trust has not been released of record by Beneficiary or according to its terms, whether or not any credit or amounts have been advanced and whether or not any such advance is subject to the satisfaction of any conditions precedent, the lien on the Collateral constituting real property and the security interest in and pledge relating to the Collateral constituting personal property created hereby shall remain in effect with the priority date established by the recording or filing hereof, notwithstanding the fact that from time to time the outstanding balance of the credit facilities or other loans outstanding under the Lending Agreement may be zero.

## ARTICLE 2 – ASSIGNMENT OF PRODUCTION PROCEEDS, RENTS AND LEASEHOLD INTERESTS

Section 2.1  Assignment of Production Proceeds.  As further security for the payment and performance of the Obligations, Grantors hereby absolutely and unconditionally assign and transfer to the Beneficiary, effective upon an Event of Default, all Minerals (and the Proceeds therefrom) which are produced, extracted or severed from or attributable to the Lands and, effective automatically upon an Event of Default, Grantors hereby transfer, assign, warrant and convey to the Beneficiary all Minerals (and the Proceeds therefrom) which are produced,

6

extracted or severed from or attributable to the Lands. Upon the occurrence of an Event of Default, all persons producing, purchasing or receiving such Minerals or the Proceeds therefrom are authorized and directed to treat the Beneficiary as the person entitled in a Grantor's place and stead to receive the same; and further, those persons will be fully protected in so treating the Beneficiary and will be under no obligation to see to the application by Beneficiary of any Proceeds received by it. Grantors agree that, if, after the occurrence of an Event of Default, any Proceeds from such Minerals are paid to a Grantor, such proceeds shall constitute trust funds in the hands of Grantors, shall be segregated from all other funds of Grantors and separately held by Grantors, and shall be forthwith paid over by Grantors to the Beneficiary. Upon the occurrence of an Event of Default, Grantors shall, if and when requested by the Beneficiary, execute and file with any production purchaser a transfer order or other instrument declaring the Beneficiary to be entitled to the Proceeds of severed Minerals and instructing such purchaser to pay such Proceeds to the Beneficiary. After the occurrence of an Event of Default, should any purchaser fail to make payment promptly to the Beneficiary of the proceeds derived from the sale thereof, the Beneficiary shall have the right, subject only to any contractual rights of such purchaser or any operator, to designate another purchaser to purchase and take such Products, without liability of any kind on the Beneficiary in making such selection so long as ordinary care is used in respect thereof.

Section 2.2  Assignment of Rents and Leasehold Interests. As further security for the payment and performance of the Obligations, Grantors hereby absolutely and unconditionally assign and transfer to Trustee, for the benefit of the Beneficiary, all the leases, income, rent, issues, deposits, profits and proceeds ("Rents") of the Lands and the Improvements to which any Grantor may be entitled, whether now due or to become due, and hereby give to and confer upon the Trustee the right, power and authority to collect such income, rents, issues, deposits, profits and proceeds of the Lands and the Improvements to which any Grantor may be entitled, whether now due, past due or to become due. This assignment constitutes an irrevocable direction and authorization of all tenants, account payors and other Persons, under any lease, contract, agreement or other Instrument to pay all income, rent, issues, deposits, profits and proceeds into an account specified by the Trustee upon demand and without further consent or other action by Grantors. Nevertheless, except upon the occurrence of an Event of Default, the Beneficiary grants to Grantors a revocable license to collect, receive, use and enjoy the Rents in a manner consistent with the Lending Agreement and other Obligations.

Section 2.3  Power-of-Attorney; Collection. Grantors hereby irrevocably appoint the Beneficiary their true and lawful attorney, at the option of the Beneficiary upon the occurrence of an Event of Default, to demand, receive and enforce payment, to give receipts, releases, and satisfactions, and to sue, either in the name of a Grantor or in the name of the Beneficiary, for all such income, rents, issues, deposits, profits and proceeds and apply the same to the Obligations secured hereby. It is understood and agreed that neither the foregoing assignments in Sections 2.1 and 2.2 nor the exercise by the Beneficiary of any of its rights or remedies under this Article 2 or otherwise hereunder shall be deemed to make the Beneficiary a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Collateral or the use, occupancy, enjoyment, or operation of all or any portion thereof. Notwithstanding anything to the contrary contained herein, so long as no Event of Default shall have occurred and be continuing, Grantors shall have a license to collect all Proceeds from the Collateral as trustee for the benefit of the Beneficiary and shall apply such Proceeds in the following order of priority: (a)

7

first, to the payment of the Obligations then due and payable, and (b) second, to such other obligations or matters as a Grantor may reasonably determine. Upon the occurrence of an Event of Default, such license shall be deemed automatically revoked and any income, rents, issues, deposits, profits and proceeds received thereafter by a Grantor shall be delivered in kind to the Beneficiary. Each Grantor hereby irrevocably constitutes and appoints the Beneficiary its true and lawful attorney-in-fact to enforce in such Grantor's name or in the Beneficiary's name or otherwise all rights of the Grantors and to do any and all things necessary and proper to carry out and implement the purposes hereof, which the Beneficiary may exercise at any time after the occurrence of an Event of Default.

Section 2.4   Grantors' Payment Duties.   Nothing contained herein will limit Grantors' duty to make payment on the Obligations when the Proceeds received pursuant to this Article 2 are insufficient to pay the costs, interest, principal and any other portion of the Obligations then owing, and the receipt of Proceeds pursuant hereto will be in addition to all other security now or hereafter existing to secure payment of the Obligations.

Section 2.5   Liability of Trustee and Beneficiary.   Neither the Trustee nor the Beneficiary has any obligation to enforce collection of any of the Proceeds or other amounts described in this Article 2, and the Trustee and the Beneficiary are hereby released from all liability and responsibility in connection therewith, except the responsibility to account to Grantors for Proceeds and other amounts actually received.

Section 2.6   Indemnification.   Grantors agree to indemnify and save and hold harmless the Trustee, the Beneficiary, their respective successors and affiliates and their respective directors, partners, managers, principals, officers, employees, agents, consultants and representatives (collectively, the "*Indemnified Parties*") from and against all claims, actions, liabilities, losses, judgments, reasonable attorneys' fees, costs and expenses and other charges of any description whatsoever (all of which are hereafter referred to in this Section 2.6 as "*Claims*") made against or sustained or incurred by any such Indemnified Party as a consequence of the assertion, either before or after the payment in full of the Obligations, that the Beneficiary received Minerals, Proceeds or rents, profits, income or proceeds of Collateral pursuant to this instrument. The Indemnified Parties have the right to employ attorneys and to defend against any Claims and unless furnished with satisfactory indemnity, after notice to Grantors, any Indemnified Party will have the right to pay or compromise and adjust all Claims in its sole reasonable discretion. Grantors shall, jointly and severally, indemnify and pay to the Indemnified Parties all amounts paid by any Indemnified Party in compromise or adjustment of any of the Claims or amounts adjudged against any Indemnified Party in respect of any of the Claims. The liabilities of Grantors as set forth in this Section 2.6 will constitute Obligations and will survive the termination of this instrument.

## ARTICLE 3 – GRANTORS' REPRESENTATIONS AND WARRANTIES

Grantors hereby represent and warrant as follows:

Section 3.1   Name and Location of Office.   Grantors have not used any corporate name or done business under any name other than their own, and each of the Grantors further covenants and agrees that it will not do so, nor will it change its state of organization outside its

present state of organization (the State of Colorado for WMTN and the State of Alaska for TGC) or relocate its chief executive office without at least thirty days' prior notice to the Trustee and the Beneficiary.

Section 3.2   Title.   Exhibit A attached hereto and incorporated herein accurately and completely sets forth and describes all real property owned, held, leased, used or controlled by Grantors, including all fee interests, patented mining claims, patented millsite claims, unpatented mining claims, unpatented millsite claims, State Mining Claims, leasehold interests, option rights and other real property interests (collectively, the "*Grantors Real Property*"), and such Exhibit A is in a form that, when appended to this instrument, is adequate and sufficient for acceptance by _____ Recording District, _____ Judicial District, Alaska for the recording of real property instruments.

Section 3.3   Leases and Royalties.   The Leases are in full force and effect, in good standing and free from breach or default, and Grantors are not aware of, and have not received notice of, any act or omission, which would constitute a material breach or default under any Lease or which would otherwise allow the lessor to terminate any Lease.   Grantors have good right and full power and authority to assign, convey, grant and to transfer the interests in the Leases, without consent of the lessor (or Grantors have obtained sufficient consent from the lessor).   Except as disclosed in writing to Beneficiary, there are no Royalties (as defined below) burdening or otherwise associated with such Lands.   For purposes hereof, "Royalties" shall mean any amount payable as a share of the product or profit from the Lands or any Minerals produced therefrom and includes without limitation, production payments, net profits interests, net smelter return royalties, landowner's royalties, minimum royalties, overriding royalties and royalty bonuses.

Section 3.4   Transportation, Utilities and Water Supply.   All utility services, means of transportation, ingress and egress roadways, easements, servitudes, rights of passage, facilities, water rights and other materials necessary for the operation of and access to the Lands (including, without limitation, gas, electrical, water supply and sewage services and facilities) are available on commercially reasonable terms in compliance with all applicable legal requirements, and Grantors are not aware of any information that would lead them to believe that any of the foregoing will not be available in the future.

Section 3.5   Payment of Taxes.   Grantors have filed or caused to be filed all material federal, state and local tax returns which to the knowledge of Grantors are required to be filed and have paid or caused to be paid all material taxes as shown on such returns or any assessment received by Grantors to the extent that such taxes or assessments have become due, except such as may be diligently contested in good faith and by appropriate proceedings or as to which a bona fide dispute may exist and for which adequate reserves are being maintained.   All Taxes, assessments, maintenance fees and other amounts required to maintain the Project have been paid in full.

Section 3.6   Compliance with Laws.   With respect to the Lands and operations thereon, Grantors have complied in all material respects with all applicable local, state and federal laws, including environmental laws, and regulations relating to the operation of the Lands, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to

result in a Material Adverse Effect, and Grantors are not aware of any investigation (other than a routine inspection) of Grantors or the Lands by any local, state or federal agency with respect to enforcement of such laws and regulations.  The existing and planned use of the Lands and the Mine complies or will comply in all material respects with all applicable legal requirements, including but not limited to applicable regulations and restrictive covenants affecting the Lands, as well as all environmental, ecological, landmark and other applicable laws and regulations; and all requirements for such use have been satisfied to the extent necessary for the current operations involving the Lands, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Except as disclosed to Beneficiary in writing, no release, emission or discharge into the environment of hazardous substances, as defined under any environmental law, has occurred or is presently occurring or will occur in operating the Lands and the Mine in its intended form in excess of federally or state permitted releases or reportable quantities, or other concentrations, standards or limitations under the foregoing laws or under any other federal, state or local laws, regulations or governmental approvals in connection with the construction, operation, ore treatment, heap leaching, fuel supply, power generation and transmission or waste disposal, or any other operations or processes relating to the Lands or the Mine, other than as allowed by or in compliance with applicable federal, state and local laws and except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Lands and Grantors' use and proposed use thereof are not and will not be in violation of any environmental, occupational safety and health or other applicable law now in effect, the effect of which violation, in any case or in the aggregate, would materially adversely affect the Lands or Grantors' use thereof, or which, in any case or in the aggregate, would impose a material liability on the Trustee or the Beneficiary or jeopardize the interest of the Trustee or the Beneficiary in the Collateral.  Except as disclosed to BOCO in writing, Grantors have no knowledge of any past or existing material violations of any such laws, ordinances or regulations issued by any governmental authority.

Section 3.7  Permits Affecting Properties.  Grantors have obtained all licenses, operating bonds, reclamation bonds, permits, authorizations and approvals from all governments, governmental commissions, boards and other agencies required in respect of their present use of and operations on the Lands.

# ARTICLE 4 – COVENANTS

Section 4.1  Affirmative Covenants.  Grantors covenant and agree that so long as any of the Obligations secured hereby remain unpaid or outstanding (except as may be specifically set forth in the Lending Agreement):

(a)  Due Payment.  Grantors will promptly pay when due, or within any applicable grace periods with respect thereto, any and all amounts for which they are obligated under the terms of this Deed of Trust and the Lending Agreement and will comply with all of the terms and provisions thereof and hereof;

(b)  Perfection; Maintenance of Liens.  Grantors shall promptly, at Grantors' own expense and insofar as not contrary to applicable law, execute such documents and provide such authorizations as Beneficiary may request so that Beneficiary may file and refile in such

offices, at such times and as often as may be necessary, any instrument as may be necessary to create, perfect, maintain and preserve the lien and security interest intended to be created hereby and the rights and remedies hereunder; shall promptly furnish to the Trustee evidence satisfactory to the Trustee of all such filings and refilings; and otherwise shall do all things necessary or expedient to be done to effectively create, perfect, maintain and preserve the liens and security interests intended to be created hereby as a valid lien of first priority on real property and fixtures and a perfected security interest in personal property and fixtures, subject to Permitted Liens. Grantors hereby authorize the Trustee and the Beneficiary to file this Deed of Trust and one or more financing or continuation statements, and amendments thereto, relative to any or all of the Collateral;

(c)    **Maintenance of Lands.** Grantors will (i) cause each of the Water Rights and Access Rights owned, held or hereafter acquired by or for Grantors and necessary or appropriate to the operation of a mine or mines upon the Lands to be kept in full force and effect by the payment of whatever sums may become payable and by the fulfillment of whatever other obligations, and the performance of whatever other acts may be required to the end that forfeiture or termination of each such interest shall be prevented unless the termination, forfeiture or other relinquishment of the interest is authorized by any operating plan or plan of operations then in effect thereunder, (ii) conduct all drilling, mining, exploratory work and related operations and activities in accordance with applicable federal, state and local laws and good and minerlike practice, (iii) maintain Grantors as the sole owners of, and retain exclusive possession of, all Lands, free and clear of all Liens, subject, in the case of State Mining Claims, only to the paramount title of the State of Alaska and Permitted Liens, (iv) timely pay all required claim maintenance fees, and timely record and file in the appropriate county, state and federal offices adequate affidavits and notices of timely payment of such fees, and amend, relocate, and locate new mining claims with respect to those mining claims as reasonably necessary to protect the Grantors' and the Trustee's interest in the Collateral, (v) timely make all payments and perform all obligations to prevent the forfeiture or termination of any portion of the Lands, (vi) permit the Trustee and the Beneficiary, through their employees, representatives and agents, to enter upon the Lands at any time, subject to appropriate safety procedures, for the purpose of investigating and inspecting the condition and operation of the Collateral, and do all other things necessary or proper to enable the Trustee and the Beneficiary to exercise this right upon reasonable notice at such times as the Trustee or the Beneficiary may reasonably request, and (vii) do all other things necessary to preserve and maintain the right, title and interest of the Trustee and the Beneficiary in the Collateral. Grantors shall not abandon all or any portion of the Lands that are producing or capable of commercial production or forfeit, surrender or release any lease, sublease, operating agreement or other agreement or instrument comprising or affecting the Collateral without the Beneficiary's consent;

(d)    **Maintenance of State Mining Claims.** To the extent not otherwise addressed herein, Grantors covenant and agree to timely pay all rentals, royalties, fees, and other required payments and to timely make all filings and recordings, including affidavits of labor, and to otherwise timely take all other necessary actions and pay such amounts relating to the preservation, maintenance, continuance and validity of the State Mining Claims as may be required by any federal, state or local governmental authority, including making of cash in lieu labor payments to the State of Alaska on or before August 1st of each year. Grantors further covenant and agree to provide the Beneficiary, on or before August 1 of each year, written notice

11

and evidence of the performance of annual labor or making of a cash in lieu labor payment and other required payments and the filing of the affidavit of performance of annual labor and recording of such affidavit.  In the event that the Beneficiary has not received the notice and evidence described in the preceding sentence by August 1, the Trustee or the Beneficiary may, on behalf of the Grantors, make and pay any rental, royalty, fee or other required payments, in which event the Grantors shall promptly reimburse the Trustee and the Beneficiary for any such payments, with interest at the rate set forth in the Lending Agreement or the maximum rate permitted by applicable law, whichever is greater, in addition to any costs and expenses incurred in making such payments, and all such amounts shall be Obligations hereunder;

(e)     Maintenance of Collateral.  Grantors will keep all Improvements, Personal Property, inventory and fixtures of every kind now or hereafter included in the Collateral in good working order and condition (ordinary wear and tear excepted), and all repairs, renewals, replacements, additions, substitutions and improvements needful to such end shall be promptly made. Grantors will comply in all material respects with all of the terms and conditions of all leases, agreements and other instruments of title and all Access Rights and privileges necessary for the proper operation of such leases and instruments, and otherwise do all things necessary to keep Grantors' rights and Beneficiary's interest in the Collateral unimpaired;

(f)     Compliance with Laws and Permits.  Grantors will (i) comply in all material respects with all lawful rulings and regulations of each regulatory authority having jurisdiction over Grantors or the Lands; (ii) conduct any and all operations and activities on the Lands in compliance in all material respects with applicable federal, state and local laws, rules and regulations and with all Permits; (iii) reclaim the Lands in accordance with applicable federal, state and local laws, rules and regulations and all Permits; and (iv) obtain and maintain in full force and effect all Permits necessary or appropriate for the use or operation of the Collateral or activities on the Lands, in each case as currently conducted;

(g)     Payment of Obligations.  Grantors will pay when due all liabilities and obligations of any nature, including all liabilities and obligations for labor, material, equipment and contracted services, incurred in or arising from the administration, operation or use of the Lands and the other Collateral;

(h)     Protection of Collateral.  Grantors will protect every part of the Collateral from removal, destruction and damage, and will protect same from the doing or suffering to be done of any act, other than the use of the Collateral as hereby contemplated, whereby the value of the Collateral may be lessened;

(i)     Insurance.  Grantors will carry (i) workmen's compensation insurance covering persons who are employed by or for the benefit of Grantors or the Mine in compliance with applicable laws, and (ii) other insurance as may be required by the Lending Agreement;

(j)     Further Assurances.  Grantors shall execute, acknowledge and deliver to the Trustee and the Beneficiary all and any such other and further instruments, documents and certificates and do and perform such other acts as in the opinion of the Trustee or the Beneficiary may be necessary or desirable to implement, effect and maintain the intent of this Deed of Trust, upon the reasonable request of the Trustee or the Beneficiary, and at Grantors' expense;

12

(k)    Defend Title.  Grantors warrant and shall forever defend the Collateral against every person whomsoever lawfully claiming the same or any part thereof, and Grantors shall maintain and preserve the lien and security interest herein created until this instrument has been terminated and released as provided herein.  If the title or the right of Grantors or the Trustee or the Beneficiary to the Lands or any other Collateral or any part thereof shall be challenged or attacked, either directly or indirectly, or if any legal proceedings are commenced against Grantors or all or any portion of the Lands, Grantors shall promptly give written notice thereof to the Trustee and, at Grantors' own expense, shall proceed diligently to defend against any such attack or proceedings, and the Trustee and the Beneficiary may take such independent action in connection therewith as either of them may, in its reasonable discretion, deem advisable to protect its interest in the Collateral, and all costs, expenses and reasonable attorneys' fees incurred by the Trustee or the Beneficiary in connection therewith shall be a demand obligation owing by Grantors, and shall bear interest at the rate set forth in the Lending Agreement or the maximum rate permitted by applicable law, whichever is greater, from the date such expenses are incurred until paid, and shall be part of the Obligations;

(l)    Change in Mining Law.  In the event of the repeal or modification of the current General Mining Law of 1872 or Alaska Mining Law (Alaska Stat. §§ 38.05.185-275) during the term of this Deed of Trust, such that the interest of Grantors in those lands which are material to the exploration, development or operation of the Lands is affected, modified or transformed, Grantors will use their best efforts to retain their interest in those lands and will consult with the Trustee and the Beneficiary to determine how best to preserve the interest of Grantors and the interest of the Trustee and the Beneficiary in the affected Collateral, and Grantors shall take no action, which in the reasonable opinion of the Trustee or the Beneficiary or their counsel could adversely affect or materially impair their interest in the Collateral or under this Deed of Trust;

(m)    Information.  Grantors shall promptly furnish to the Trustee and the Beneficiary such information concerning Grantors, Grantors' business affairs and financial condition, the Collateral and the operations and financial condition of Grantors, as the Trustee or the Beneficiary may reasonably request; and

(n)    Access.  Grantors shall keep proper books, records and accounts in which complete and correct entries shall be made of Grantors' transactions in accordance with generally accepted accounting principles, and shall keep the records concerning the accounts and contract rights included in the Collateral at Grantors' respective place(s) of business, and the Trustee and the Beneficiary shall have the right to inspect such records, and Grantors shall furnish copies upon reasonable request and upon reasonable notice.

## ARTICLE 5 – DEFAULT

The occurrence of any one or more of the following events in Section 5.1(a) through Section 5.1(f) shall constitute an "Event of Default":

Section 5.1  Events of Default.  The term "Event of Default" shall have the meaning given thereto in the Lending Agreement.

Section 5.2  Acceleration Upon Default.  Upon the occurrence of any Event of Default, or at any time thereafter during the continuance of an Event of Default, the Beneficiary may, at its option, by notice to Grantors, declare all Obligations to be due and payable forthwith without any further notice, presentment or demand of any kind, all of which are hereby expressly waived.

Section 5.3  Possession and Operation of Property.  Upon the occurrence of any Event of Default, or at any time thereafter during the continuance of an Event of Default, and in addition to all other rights therein conferred on the Trustee or the Beneficiary, the Trustee, the Beneficiary or any person, firm or corporation designated by the Beneficiary, will have the right and power, but will not be obligated, to have an audit performed, at Grantors' expense, of the books and records of any Grantor, and to enter upon and take possession of all or any part of the Collateral, to exclude any Grantor therefrom, and to hold, use, administer and manage the same to the extent that any Grantor could do so.  The Trustee, the Beneficiary or any person, firm or corporation designated by the Beneficiary, may manage the Collateral, or any portion thereof, without any liability to Grantors in connection with such management; and the Trustee, the Beneficiary or any person, firm or corporation designated by the Beneficiary will have the right to collect, receive and demand for all Products  produced and sold from the Lands, and to exercise every power, right and privilege of Grantors with respect to the Collateral.  Providing there has been no foreclosure sale, when and if the expenses of the management of the Collateral have been paid and the Obligations irrevocably paid and satisfied in full, the remaining Collateral shall be returned to Grantors.

Section 5.4  Ancillary Rights.  Upon the occurrence of an Event of Default, and in addition to all other rights of the Beneficiary hereunder, the Beneficiary may, without notice, demand or declaration of default, all of which are hereby expressly waived by Grantors, proceed by a suit or suits in equity or at law (i) for the seizure and sale of the Collateral or any part thereof, (ii) for the specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted, (iii) for the foreclosure or sale of the Collateral or any part thereof under the judgment or decree of any court of competent jurisdiction, (iv) without regard to the solvency or insolvency of any person, and without regard to the value of the Collateral, and without notice to Grantors (notice being hereby expressly waived), for the ex parte appointment of a receiver to serve without bond pending any foreclosure or sale hereunder, or (v) for the enforcement of any other appropriate legal or equitable remedy.

Section 5.5  Availability of Rights and Remedies; Cumulative Rights and Remedies.  Upon the occurrence of an Event of Default, all of the rights and remedies provided to the Trustee or the Beneficiary in this Deed of Trust and any other collateral security documents shall immediately become available to the Trustee and the Beneficiary, and the Trustee and the Beneficiary shall have all other rights and remedies available at law or in equity.  All rights and remedies of the Trustee and the Beneficiary set out in this Deed of Trust, any other collateral security document and as otherwise available at law or in equity are cumulative, and no right or remedy contained herein or therein is intended to be exclusive; each such right and remedy is in addition to every other right and remedy contained in this Deed of Trust, any other collateral security document or in any existing or future agreement or now or in the future existing at law, in equity, by statute or otherwise.  Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary or to which either of them may be otherwise entitled, may be exercised concurrently or independently, from time to time and as often as may be deemed

14

expedient by the Trustee or the Beneficiary, and either of them may pursue inconsistent remedies.

## ARTICLE 6 – BENEFICIARY'S RIGHTS AS TO REALTY COLLATERAL UPON DEFAULT

Section 6.1   Deed of Trust or Mortgage.   Upon the occurrence of an Event of Default, the Beneficiary or the Trustee may declare all sums secured hereby immediately due and payable either by commencing an action to foreclose this Deed of Trust, or by the delivery to the Trustee of a written declaration of default and demand for sale and of written notice of default and of election to cause the Collateral to be sold, which notice the Trustee shall cause to be duly filed for record in case of foreclosure by exercise of the power of sale herein.   The decision by the Beneficiary to pursue its remedies and foreclose either by exercise of the power of sale (and as otherwise set forth herein) or by judicial foreclosure (and as otherwise set forth herein) may be made by the Beneficiary at the Beneficiary's sole option and discretion.

Section 6.2   Judicial Foreclosure.   Upon the occurrence of an Event of Default, in lieu of the exercise of the non-judicial power of sale hereafter given, the Beneficiary may, subject to any mandatory requirement of applicable law, proceed by suit to foreclose its lien hereunder and to sell or have sold the Collateral or any part thereof at one or more sales, as an entirety or in parcels, at such place or places and otherwise, in such manner and upon such notice as may be required by law, or, in the absence of any such requirement, as the Beneficiary may deem appropriate, and the Beneficiary shall thereafter make or cause to be made a conveyance to the purchaser or purchasers thereof.   The Beneficiary may postpone the sale of the real property included in the Collateral or any part thereof by public announcement at the time and place of such sale, and from time to time thereafter may further postpone such sale by public announcement made at the time of sale fixed by the preceding postponement.   Sale of a part of the real property included in the Collateral will not exhaust the power of sale, and sales may be made from time to time until all such property is sold or the Obligations are paid in full.

Section 6.3   Non-Judicial Foreclosure; Power of Sale.   Upon the occurrence of an Event of Default, the Trustee is hereby authorized and empowered, and it shall be its duty, upon request of the Beneficiary, and to the extent permitted by applicable law, to exercise the power of sale contained herein and sell any part of the Collateral at one or more sales, as an entirety or in parcels, at such place or places and otherwise in such manner and upon such notice as may be required by applicable law, or in the absence of any such requirement, as Beneficiary may deem appropriate, and Trustee shall make conveyance to the purchaser or purchasers thereof.   Any sale shall be made to the highest bidder for cash at the door of the county courthouse of, or in such other place as may be required or permitted by applicable law in, the county in the state where the Collateral or any part thereof is situated; provided that and if the Collateral lies in more than one county, such part of the Collateral may be sold at the courthouse door of any one of such counties, and the notice so posted shall designate in which county such property shall be sold. Any such sale shall be made at public outcry, on the day of any month, during the hours of such day and after such written notices thereof have been published, recorded and publicly posted in such places and for such time periods and after all persons entitled to notice thereof have been sent such notice, all as required by applicable law in effect at the time of such sale.   The affidavit of any person having knowledge of the facts to the effect that such a service and notice was

completed shall be prima facie evidence of the fact of service and notice. Grantors agree that no notice of any sale, other than as required by applicable law, need be given by Grantors, the Beneficiary or any other person. Each Grantor hereby designates as its address for the purposes of such notice the address set out on page one hereof; and agrees that such address shall be changed only by depositing notice of such change enclosed in a postpaid wrapper in a post office or official depository under the care and custody of the United States Postal Service, certified mail, postage prepaid, return receipt requested, addressed to the Beneficiary or other holder of the Obligations at the address for the Beneficiary set out herein (or to such other address as the Beneficiary or other holder of the Obligations may have designated by notice given as above provided to Grantors and such other debtors). Any such notice or change of address of Grantors or other debtors or of the Beneficiary or of other holder of the Obligations shall be effective upon receipt. Grantors authorize and empower the Trustee to sell the Collateral in lots or parcels or in its entirety as the Trustee shall deem expedient; and to execute and deliver to the purchaser or purchasers thereof good and sufficient deeds of conveyance thereto, and the title of such purchaser or purchasers when so made by the Trustee, Grantors bind themselves to warrant and forever defend, subject to Permitted Liens and the paramount ownership of the State of Alaska as to any State Mining Claims. Where portions of the Collateral lie in different counties, sales in such counties may be conducted in any order that the Trustee may deem expedient; and one or more such sales may be conducted in the same month, or in successive or different months as the Trustee may deem expedient.

## ARTICLE 7 – BENEFICIARY'S RIGHTS AS TO PERSONALTY AND FIXTURE COLLATERAL UPON DEFAULT

Section 7.1 <u>Personalty Collateral</u>. Upon the occurrence of an Event of Default, the Beneficiary may, without notice to Grantors, exercise its rights to declare all of the Obligations to be immediately due and payable, in which case the Beneficiary will have all rights and remedies granted by law, and particularly by the UCC, including, but not limited to, the right to take possession of any and all Collateral constituting personal property (the "*Personalty Collateral*"), and for this purpose the Beneficiary may enter upon any premises on which any or all of the Personalty Collateral is situated and take possession of and operate the Personalty Collateral or remove it therefrom. The Beneficiary may require Grantors to assemble the Personalty Collateral and make it available to the Beneficiary or the Trustee at a place to be designated by Beneficiary which is reasonably convenient to all parties. Unless the Personalty Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Beneficiary will give Grantors reasonable notice of the time and place of any public sale or of the time after which any private sale or other disposition of the Personalty Collateral is to be made. This requirement of sending reasonable notice will be met if the notice is mailed, postage prepaid, to Grantors at the address designated above at least ten (10) days before the time of the sale or disposition.

Section 7.2 <u>Sale with Realty Collateral</u>. In the event of foreclosure, whether judicial or non-judicial, at the Beneficiary's option it may proceed under the Uniform Commercial Code as to the Personalty Collateral or it may proceed as to both Personalty Collateral and Collateral constituting real property in accordance with its rights and remedies in respect of the Collateral constituting real property.

Section 7.3  Private Sale.  If the Beneficiary in good faith believes that any state or federal law prohibits or restricts the customary manner of sale or distribution of any of the Personalty Collateral, or if the Beneficiary determines that there is any other restraint or restriction limiting the timely sale or distribution of any such property in accordance with the customary manner of sale or distribution, the Beneficiary may sell or may cause the Trustee to sell such property privately or in any other manner it deems advisable at such price or prices as it determines in its sole discretion and without any liability whatsoever to Grantors in connection therewith.  Grantors recognize and agree that such prohibition or restriction may cause such property to have less value than it otherwise would have and that, consequently, such sale or disposition by the Beneficiary may result in a lower sales price than if the sale were otherwise held.

## ARTICLE 8 – OTHER PROVISIONS CONCERNING FORECLOSURE

Section 8.1  Possession and Delivery of Collateral.  It shall not be necessary for the Beneficiary or the Trustee to have physically present or constructively in its possession any of the Collateral at any foreclosure sale, and Grantors shall deliver to the purchasers at such sale on the date of sale the Collateral purchased by such purchasers at such sale, and if it should be impossible or impracticable for any of such purchasers to take actual delivery of the Collateral, then the title and right of possession to the Collateral shall pass to the purchaser at such sale as completely as if the same had been actually present and delivered.

Section 8.2  Beneficiary as Purchaser.  The Beneficiary will have the right to become the purchaser at any foreclosure sale, and it will have the right to credit upon the amount of the bid the amount payable to it out of the net proceeds of sale.  If Beneficiary is the successful bidder at such sale and upon compliance with the terms of any sale, the Beneficiary may hold, retain, possess and dispose of such property in its own absolute right without further accountability, subject to any applicable rights of redemption, if any.

Section 8.3  Recitals Conclusive; Warranty Deed; Ratification.  Recitals contained in any conveyance to any purchaser at any sale made hereunder will conclusively establish the truth and accuracy of the matters therein stated, including, without limiting the generality of the foregoing, nonpayment of the unpaid principal sum of, and the interest accrued on, the written instruments constituting part or all of the Obligations after the same have become due and payable, nonpayment of any other of the Obligations or advertisement and conduct of the sale in the manner provided herein, and appointment of any successor Trustee hereunder.  Grantors ratify and confirm all legal acts that Beneficiary and/or Trustee may do in carrying out the provisions of this instrument.

Section 8.4  Effect of Sale.  Subject to any applicable rights of redemption, if any, any sale or sales of the Collateral or any part thereof will operate to divest all right, title, interest, claim and demand whatsoever, either at law or in equity, of Grantors in and to the premises and the property sold, and will be a perpetual bar, both at law and in equity, against Grantors, Grantors' successors or assigns and against any and all persons claiming or who shall thereafter claim all or any of the property sold from, through or under Grantors, or Grantors' successors or assigns.  Subject to applicable rights of redemption under applicable law, the purchaser or purchasers at the foreclosure sale will receive immediate possession of the property purchased;

17

and if any Grantor retains possession of the Collateral, or any part thereof, subsequent to sale, such Grantor will be considered a tenant at sufferance of the purchaser or purchasers, and if such Grantor remains in such possession after demand of the purchaser or purchasers to remove, such Grantor will be guilty of unlawful detainer and will be subject to eviction and removal, forcible or otherwise, and Grantors hereby waive and release any right to damages arising out of such removal.

Section 8.5   <u>Application of Proceeds</u>.  The proceeds of any sale of the Collateral or any part thereof will be applied as follows:

(a)   first, to the payment of all out of pocket expenses incurred by the Trustee and Beneficiary in connection therewith, including, without limiting the generality of the foregoing, court costs, legal fees and expenses, fees of accountants, engineers, consultants, agents or managers and expenses of any entry or taking of possession, holding, valuing, preparing for sale, advertising, selling and conveying;

(b)   second, to the payment of the Obligations; and

(c)   third, any surplus thereafter remaining to Grantors or Grantors' successors or assigns, as their interests may be established to Beneficiary's reasonable satisfaction.

Section 8.6   <u>Deficiency</u>.  Subject to applicable law, Grantors will remain liable for any deficiency owing to the Beneficiary after application of the net proceeds of any foreclosure sale.

Section 8.7   <u>Grantors' Waiver of Appraisement, Marshaling, Etc</u>.  Grantors agree that Grantors will not at any time insist upon or plead or in any manner whatsoever claim the benefit of any appraisement, valuation, stay, extension or redemption law now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this instrument, the absolute sale of the Collateral or the possession thereof by any purchaser at any sale made pursuant to this instrument or pursuant to the decree of any court of competent jurisdiction.  Grantors, for themselves and all who may claim through or under them, hereby waives the benefit of all such laws and to the extent that Grantors may lawfully do so under applicable state law, waive any and all right to have the Collateral marshaled upon any foreclosure of the lien hereof or sold in inverse order of alienation and, Grantors agree that the Collateral may be sold as an entirety.

## ARTICLE 9 – MISCELLANEOUS

Section 9.1   <u>Recording and Filing</u>.  Grantors shall pay all costs of filing, registering and recording this and every other instrument in addition or supplemental hereto and all financing statements the Beneficiary may require, in such offices and places and at such times and as often as may be, in the judgment of the Beneficiary, necessary to preserve, protect and renew the lien and security interest herein created as a first lien and prior security interest on and in the Collateral and otherwise do and perform all matters or things necessary or expedient to be done or observed by reason of any law or regulation of any State or of the United States or of any other competent authority for the purpose of effectively creating, maintaining and preserving the lien and security interest created herein and on the Collateral and the priority thereof.  Grantors shall also pay the costs of obtaining reports from appropriate filing officers concerning financing statement filings in respect of any of the Collateral in which a security interest is granted herein.

18

Section 9.2  Trustee's and Beneficiary's Right to Perform Grantors' Obligations. Grantors agree that, upon the occurrence of an Event of Default, the Beneficiary or the Trustee or any receiver appointed hereunder may, but shall not be obligated to, perform or cause to be performed such act causing such Event of Default, and any expense incurred by the Beneficiary or the Trustee in so doing shall be a demand obligation owing by Grantors to the Beneficiary, shall bear interest at the rate set forth in the Lending Agreement or the maximum rate permitted by applicable law, whichever is greater, until paid and shall be a part of the Obligations, and the Beneficiary, the Trustee or any receiver shall be subrogated to all of the rights of the party receiving the benefit of such performance.   The undertaking of such performance by the Beneficiary, the Trustee or any receiver as aforesaid shall not obligate such person to continue such performance or to engage in such performance or performance of any other act in the future, shall not relieve Grantors from the observance or performance of any covenant, warranty or agreement contained in this instrument or constitute a waiver of default hereunder and shall not affect the right of the Beneficiary to accelerate the payment of all indebtedness and other sums secured hereby or to resort to any other of its rights or remedies hereunder or under applicable law.   In the event the Beneficiary, the Trustee or any receiver appointed hereunder undertakes any such action, no such party shall have any liability to any Grantor.

Section 9.3  Discharge of Purchaser.   Upon any sale made under the powers of sale herein granted and conferred, the receipt of Beneficiary will be sufficient discharge to the purchaser or purchasers at any sale for the purchase money, and such purchaser or purchasers and the heirs, devisees, personal representatives, successors and assigns thereof will not, after paying such purchase money and receiving such receipt of Beneficiary, be obliged to see to the application thereof or be in anywise answerable for any loss, misapplication or nonapplication thereof.

Section 9.4  Indebtedness of Obligations Absolute.   Nothing herein contained shall be construed as limiting the Beneficiary to the collection of any indebtedness of Grantors to the Beneficiary only out of the income, revenue, rents, issues and profits from the Collateral or as obligating the Beneficiary to delay or withhold action upon any default which may be occasioned by failure of such income or revenue to be sufficient to retire the principal or interest when due on the indebtedness secured hereby.   It is expressly understood between the Beneficiary and Grantors that any indebtedness of Grantors to the Beneficiary secured hereby shall constitute an absolute, unconditional obligation of Grantors to pay as provided herein or therein in accordance with the terms of the instrument evidencing such indebtedness in the amount therein specified at the maturity date or at the respective maturity dates of the installments thereof, whether by acceleration or otherwise.

Section 9.5  Defense of Claims.   The Trustee will promptly notify Grantors and the Beneficiary in writing of the commencement of any legal proceedings affecting Beneficiary's or Trustee's interest in the Collateral, or any part thereof, and shall take such action, employing attorneys acceptable to the Beneficiary (acting reasonably), as may be necessary to preserve the Grantors', the Trustee's and the Beneficiary's rights affected thereby; and should Grantors fail or refuse to take any such action, the Trustee or the Beneficiary may take the action on behalf of and in the name of Grantors and at Grantors' expense.   Moreover, the Beneficiary or the Trustee on behalf of Beneficiary may take independent action in connection therewith as they may in their discretion deem proper, and Grantors hereby agree to make reimbursement for all sums

19

advanced and all expenses incurred in such actions plus interest at the rate set forth in the Lending Agreement or the maximum rate permitted by applicable law, whichever is greater.

Section 9.6   Termination and Reconveyance.  If all the Obligations are irrevocably and finally paid in full, the covenants herein contained are well and truly performed, and the Lending Agreement is terminated and no longer in effect, and if Grantors and the Beneficiary intend at such time that this instrument not secure any obligation of Grantors thereafter arising, then the Beneficiary shall, at Grantors' cost and expense, deliver or cause to be delivered to Grantors proper instruments executed by the Trustee evidencing the reconveyance of this instrument. Until such delivery, this instrument shall remain and continue in full force and effect.  All indemnifications provided by Grantors for the benefit of the Trustee and/or the Beneficiary shall survive any release, termination or reconveyance of this Deed of Trust and shall remain in full force and effect.

Section 9.7   Renewals, Amendments and Other Security.   Renewals, restatements, replacements and extensions of the Obligations may be given at any time, amendments may be made to the agreements with third parties relating to any part of the Obligations or the Collateral, and the Beneficiary or the Trustee may take or hold other security for the Obligations without notice to or consent of Grantors.  The Trustee or the Beneficiary may resort first to other security or any part thereof, or first to the security herein given or any part thereof, or from time to time to either or both, even to the partial or complete abandonment of either security, and such action will not be a waiver of any rights conferred by this instrument.

Section 9.8   Successor Trustees.   The Trustee may resign in writing addressed to Beneficiary or be removed at any time with or without cause by an instrument in writing duly executed by Beneficiary.  In case of the resignation or removal of the Trustee, a successor Trustee may be appointed by Beneficiary by instrument of substitution complying with any applicable requirements of law, and in the absence of any such requirement, without other formality than an appointment and designation in writing.  Any appointment and designation will be full evidence of the right and authority to make the same and of all facts therein recited.  Upon the making of any appointment and designation, all the estate and title of the Trustee in all of the Collateral will vest in the named successor Trustee, and the successor will thereupon succeed to all the rights, powers, privileges, immunities and duties hereby conferred upon the Trustee.  All references herein to the Trustee will be deemed to refer to the Trustee from time to time acting hereunder.

Section 9.9   Limitations on Interest.  No provision of the Lending Agreement, this Deed of Trust, or other instrument constituting or evidencing any of the Obligations or any other agreement between the parties shall require the payment or permit the collection of interest in excess of the maximum non-usurious rate which Grantors may agree to pay under applicable laws.  The intention of the parties being to conform strictly to applicable usury laws now in force, the interest on the principal amount of the Lending Agreement and the interest on other amounts due under and/or secured by this instrument shall be held to be subject to reduction to the amount allowed under said applicable usury laws as now or hereafter construed by the courts having jurisdiction, and any excess interest paid—when considering the Obligations as a whole—shall first be applied to principal then outstanding under the Obligations, with any remainder credited to Grantors as applicable.

Section 9.10   Effect of Instrument.  This instrument shall be deemed and construed to be, and may be enforced as, an assignment, chattel mortgage or security agreement, common law pledge, contract, deed of trust, financing statement, and as any one or more of them if appropriate under applicable state law.   This instrument shall be effective as a financing statement covering minerals, As-Extracted Collateral or the like and accounts subject to Article 9 of the UCC as enacted in the appropriate jurisdiction and is to be filed for record in the Office of the County Recorder or other appropriate office of each county where any part of the Collateral is situated.  A carbon, photographic, or other reproduction of this Deed of Trust or of any financing statement relating to this Deed of Trust shall be sufficient as a financing statement.

Section 9.11   Unenforceable or Inapplicable Provisions.  If any provision hereof or of any of the written instruments constituting part or all of the Obligations is invalid or unenforceable in any jurisdiction, whether with respect to all parties hereto or with respect to less than all of such parties, the other provisions hereof and of the written instruments will remain in full force and effect in that jurisdiction with respect to the parties as to which such provision is valid and enforceable, and the remaining provisions hereof will be liberally construed in favor of Beneficiary in order to carry out the provisions hereof.  The invalidity of any provision of this instrument in any jurisdiction will not affect the validity or enforceability of any provision in any other jurisdiction.

Section 9.12   Rights Cumulative.

(a)   Each and every right, power and remedy given to the Beneficiary herein or in any other written instrument relating to the Obligations will be cumulative and not exclusive; and each and every right, power and remedy whether specifically given herein or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Beneficiary, and the exercise, or the beginning of the exercise, of any such right, power or remedy will not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy.  No waiver, delay, omission, or forbearance by the Beneficiary of any right, power or remedy hereunder or under applicable law on any occasion will act as, or shall be deemed to be, a bar to the exercise of any right, power or remedy on any subsequent occasion or shall otherwise exhaust or impair any such right, power or remedy or shall be deemed to waive any Event of Default or to constitute acquiescence.  Every right, power and remedy given to the Trustee or the Beneficiary may be exercised from time to time and as often as may be deemed expedient by the Trustee or the Beneficiary.

(b)   No failure on the part of the Beneficiary to exercise, no course of dealing with respect to, and no delay on the part of the Beneficiary in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.

(c)   In the event that the Beneficiary shall have instituted any proceeding to enforce any right, power, privilege or remedy under this Deed of Trust or any other documents executed in connection with the Obligations by foreclosure, sale, entry or otherwise, and such proceeding shall have been halted, discontinued, delayed or abandoned for any reason, then and in every such case, the Grantors and the Beneficiary shall be restored to their respective former

21

positions and rights hereunder with respect to the Collateral, and all rights, remedies, privileges and powers of the Beneficiary shall continue as if no such proceeding had been instituted.

Section 9.13   Non-Waiver.   No act, delay, omission or course of dealing between the Beneficiary and Grantors will be a waiver of any of the Beneficiary's rights or remedies hereunder or under applicable law.  No waiver, change or modification in whole or in part of this instrument or any other written instrument will be effective unless in a writing signed by the Beneficiary.

Section 9.14   Beneficiary's Expenses.   Grantors agree to pay in full all reasonable costs and expenses, including attorneys' fees, of the Beneficiary or the Trustee which may have been or may be incurred by the Beneficiary or the Trustee in connection with the collection of the Obligations and the enforcement of any of Grantors' obligations hereunder and under any documents executed in connection with the Obligations.

Section 9.15   Indemnification.   In addition to any other indemnifications or similar obligations contained in this instrument or elsewhere, Grantors hereby indemnify, save and hold harmless, and agree to defend, the Beneficiary and the Trustee, their respective successors and assigns, their respective affiliates and their respective directors, partners, managers, principals, officers, employees, agents, consultants and representatives (each, an "*Indemnified Party*") from, and no such Indemnified Party shall be liable for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, fines, suits, costs, charges, claims, taxes, fees, expenses, payments or disbursements of any kind whatsoever, including attorneys' fees and expenses (collectively "*Losses*") which may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, incurred or suffered by or asserted or claimed against any Indemnified Party in any way relating to, arising out of or resulting from: (a) this Deed of Trust, the Lending Agreement, or any instrument contemplated by or referred to herein or therein (including exercise by the Beneficiary or the Trustee of any right, power or remedy conferred upon it by this instrument or any other instrument pertaining hereto, or from the attempt or failure of the Beneficiary or the Trustee to exercise any such right, power or remedy); (b) the transactions contemplated hereby or by the Lending Agreement; (c) any act or omission of Grantors; (d) the ownership, management, administration, development, operation, use, reclamation or condition of the Lands, the other Collateral, the Mine or any other property; (e) any actual or alleged presence or release of hazardous materials on, in or from any property owned or operated by Grantors, including the Lands or any portion of the Mine, or any environmental liability related in any way to Grantors or any Related Party, or any breach or violation of, or alleged breach or violation of, any environmental law by Grantors or any Related Party; and (f) the business, operations, activities, decisions or actions of Grantors. Notwithstanding any provision hereof to the contrary, the foregoing indemnity shall in all respects survive, continue and remain in full force and effect even though all Obligations, indebtedness and other sums secured hereby may be fully paid and the lien of this instrument released.

Section 9.16   Partial Releases.   In the event Grantors sell for monetary consideration or otherwise any portion of the Collateral, in compliance with and as permitted by the Lending Agreement or this Deed of Trust, and upon delivery of the proceeds of such sale to Beneficiary for application toward the Obligations, the Beneficiary shall cause the Trustee to release the lien

22

of this instrument with respect to the portion sold, at the reasonable request of Grantors, at Grantors' cost and expense.  No release from the lien of this instrument of any part of the Collateral by Beneficiary shall in anywise alter, vary or diminish the force, effect or lien of this instrument on the balance or remainder of the Collateral.

Section 9.17  Subrogation.  This instrument is made with full substitution and subrogation of Beneficiary and Trustee in and to all covenants and warranties by others heretofore given or made in respect of the Collateral or any part thereof.

Section 9.18  Notice.  All notices and deliveries of information hereunder shall be deemed to have been duly given if actually delivered or mailed by registered or certified mail, postage prepaid, addressed to the parties hereto at the addresses set forth above on page 1; if by mail, then as of the date of such mailing.  Each party may, by written notice so delivered to the others, change the address to which delivery shall thereafter be made.

Section 9.19  Successors.  This instrument shall bind and inure to the benefit of the respective successors and assigns of the parties.

Section 9.20  Interpretation.

(a)  Article and section headings used in this instrument are intended for convenience only and shall be given no significance whatever in interpreting and construing the provisions of this instrument.

(b)  As used in this instrument, "Beneficiary" and "Trustee" include their respective successors and assigns.  Unless context otherwise requires, words in the singular number include the plural and in the plural number include the singular.  Words of the masculine gender include the feminine and neuter gender and words of the neuter gender may refer to any gender.

(c)  Any reference to Grantors, any Grantor, a Grantor, the Grantor or other language referencing the Grantors, whether collectively or individually, shall be interpreted to refer to the Grantors, each Grantor, or an individual Grantor, as applicable, so as to maximize and preserve all rights of Beneficiary and Trustee under this Deed of Trust, the Lending Agreement and the Obligations.  Reference to Grantors in lieu of a particular Grantor or each respective Grantor, or vis-a-versa, is not intended to, nor shall it be interpreted as, in any way limiting or affecting the rights of Beneficiary and Trustee hereunder.

Section 9.21  Counterparts.  This instrument may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, and all of which are identical except that to facilitate recordation, in particular counterparts hereof, portions of Exhibit A hereto which describe properties situated in counties other than the county in which the counterpart is to be recorded may be omitted.

Section 9.22  Survival of Representations and Warranties.  All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Deed of Trust and the advance of any amounts or credit facilities in connection with the Lending Agreement.

Section 9.23   Rights Absolute.   All rights of the Trustee and the Beneficiary and the deed of trust, pledge, assignment, charge and security interest hereunder, and all obligations of the Grantors hereunder, shall be absolute and unconditional, irrespective of:

(a)   any lack of validity or enforceability of the Lending Agreement or any other agreement or instrument relating thereto;

(b)   any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the same, including, without limitation, any increase in the Obligations;

(c)   any taking, exchange, release or non-perfection of any other collateral, or any taking, release, amendment or waiver of or consent to departure from any guaranty, surety or support agreement for all or any of the Obligations;

(d)   any manner of application of collateral or proceeds thereof, to all or any of the Obligations, or any manner of sale or other disposition of any collateral for all or any of the Obligations or any other assets of any principal, guarantor or surety;

(e)   any change, restructuring or termination of the corporate or company structure or existence of Grantors or any affiliate thereof; and

(f)   any other circumstance that might otherwise constitute a defense available to, or a discharge of, Grantors or any affiliate of Grantors, any other Person liable for the Obligations or a third party guarantor or grantor of a security interest.

Section 9.24   Joint and Several Liability.   Grantors and any guarantor of the Obligations are engaged in related businesses and are integrated to such an extent that the financial strength and flexibility of each such party has a direct, tangible and immediate impact on the success of the other parties.  Grantors have and will continue to derive substantial and immediate direct and indirect benefit from the Lending Agreement, Obligations, and the transactions entered into in connection therewith.  Grantors expressly waive any right to revoke, terminate or suspend this Deed of Trust and acknowledges that they entered into the Lending Agreement and this Deed of Trust in contemplation of the benefits that they would receive by the same.

Section 9.25   Entire Agreement; Exhibits.   The Exhibits to this Deed of Trust form an integral part of this Deed of Trust and are incorporated herein by reference and expressly made a part hereof.  This Deed of Trust constitutes the entire agreement among the parties with respect to the subject matter hereof, superseding all prior statements, representations, discussions, agreements and understandings, oral or written, relating to such subject matter, including all term sheets and commitment letters.

Section 9.26   No Obligation to Advance.   Grantors confirm that value has been given by the Beneficiary to Grantors, that Grantors have rights in the Collateral existing at the date of this Deed of Trust, and that Grantors and the Beneficiary have not agreed to postpone the time for attachment of the security interest granted hereby to any of the Collateral.  The security interest created by this Deed of Trust shall have effect and be deemed to be effective whether or not the

Obligations or any part thereof are owing or in existence before or after or upon the date of this Deed of Trust. Neither the execution and delivery of this Deed of Trust, nor the provision of any financial accommodation by Beneficiary, shall oblige Beneficiary to make any financial accommodation or further financial accommodation available to Grantors or any other Person.

Section 9.27   Acknowledgments. Grantors hereby acknowledge that:

(a)   The Beneficiary has no fiduciary relationship with or duty to Grantors or any Related Party arising out of or in connection with this Deed of Trust or any other agreement, arrangement, Instrument or investment, and the relationship between the Beneficiary and the Grantors and any Related Party in connection herewith is solely that of debtor and creditor;

(b)   No joint venture, partnership, mining partnership, agency relationship or fiduciary duty, and no joint venture, partnership, mining partnership, agency relationship or fiduciary duty exists, or shall be deemed to exist, between Beneficiary and Grantors or any Related Party;

(c)   Beneficiary is and has been acting solely as a principal, and Beneficiary has not been, is not, and will not be, acting as an advisor, agent or fiduciary for Grantors or any Related Party;

(d)   Beneficiary may be engaged in a broad range of transactions that involve interests that differ from those of Grantors, any Related Party and their affiliates, and Beneficiary has no obligation to disclose any such interests to Grantors, any Related Party or their affiliates; and

(e)   no Related Party will claim that the Beneficiary has rendered advisory services of any nature or with respect to, or owes a fiduciary or similar duty to, any Related Party in connection with this Deed of Trust, the Lending Agreement or otherwise.

Section 9.28   [Intentionally Omitted]

Section 9.29   Governing Law. This Deed of Trust shall be governed by the laws of the State of Alaska.

Section 9.30 **WAIVER OF JURY TRIAL.   GRANTORS HEREBY (a) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY A JURY, AND (b) WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH GRANTORS MAY BE PARTY, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO THIS DEED OF TRUST AND/OR ANY TRANSACTIONS, OCCURRENCES, COMMUNICATIONS, OR UNDERSTANDINGS (OR THE LACK OF ANY OF THE FOREGOING) RELATING IN ANY WAY TO THE DEBTOR-CREDITOR RELATIONSHIP BETWEEN THE PARTIES.   IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS DEED OF TRUST. THIS WAIVER OF JURY TRIAL IS SEPARATELY GIVEN, KNOWINGLY,**

**WILLINGLY AND VOLUNTARILY MADE BY GRANTORS AND GRANTORS HEREBY AGREE THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.   TRUSTEE AND BENEFICIARY ARE EACH HEREBY AUTHORIZED TO SUBMIT THIS DEED OF TRUST TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER, SO AS TO SERVE AS CONCLUSIVE EVIDENCE OF SUCH WAIVER OF RIGHT TO TRIAL BY JURY.   GRANTORS REPRESENT AND WARRANT THAT THEY HAVE BEEN REPRESENTED IN THE SIGNING OF THIS DEED OF TRUST AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF THEIR OWN FREE WILL, AND/OR THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.**

Section 9.31    [Intentionally Omitted]

Section 9.32    <u>Maturity</u>.  The maturity of this instrument, for purposes of A.S. 34 20.150 or any similar statute, shall occur upon the full satisfaction of all indebtedness and other obligations secured by this instrument, or fifty (50) years from the execution of this instrument, whichever is earlier.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, this Deed of Trust has been duly and validly executed and delivered by Grantors as of the date first written above.

GRANTORS:

**WestMountain Gold, Inc.**

By:_____
     Name:
     Title:

STATE OF                )
                        ) ss.
COUNTY OF           )

This instrument was acknowledged before me on [*], 2017, by _____ as _____ of WestMountain Gold, Inc., a Colorado corporation.


_____
*(Signature of Notarial Officer)*

[Seal]

**Terra Gold Corp.**


By:_____
     Name:
     Title:

STATE OF                )
                        ) ss.
COUNTY OF           )

This instrument was acknowledged before me on [*], 2017, by _____ as _____ of Terra Gold Corp., an Alaska corporation.


_____
*(Signature of Notarial Officer)*

[Seal]
{00645314.DOCX; 8}             *[Signature Page to Deed of Trust]*

## Exhibit A

### To

### Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Financing Statement and Fixture Filing From WestMountain Gold, Inc. and Terra Gold Corp., as Grantors, to [TBD], as the Trustee, and BOCO Investments, LLC, as Beneficiary

### Grantor Real Property

**The following real property interests located in Mt. McKinley Recording District, _____Judicial District Alaska:**

1. Owned Real Property

See Schedule 1 hereto.


2. Leased Real Property

Lease, dated March 22, 2005, between Ben Porterfield and AngloGold Ashanti (USA) Exploration Inc. as subsequently assigned to TGC for the following State Mining Claims:

See Schedule 2 hereto.